AETNA CASUALTY & SURETY COMPANY, et al.,
Appellants,

v.

COMMONWEALTH of Kentucky, Natural Resources and Environmental Protection Cabinet, et al., Appellees,

and

Westinghouse Hittman Nuclear, Inc., et al., Cross–Appellants,

v.

Aetna Casualty & Surety Company, et al., Cross–Appellees,

and

Atcor, Inc., et al., Cross–Appellants,

v.

Aetna Casualty & Surety Company, et al., Cross–Appellees.

No. 2002–SC–307–DG, 2002–SC–407–DG, 2002–SC–408–DG.

Supreme Court of Kentucky.

Sept. 22, 2005.

As Modified on Grant of Rehearing Jan. 19, 2006.

Roger E. Warin, Kenneth I. Jonson, Samuel T. Perkins, Steptoe & Johnson LLP, Washington, D.C., O. Grant Bruton, C. Kent Hatfield, John W. Bilby, Middleton & Reutilnger, Louisville, KY, Counsel for Appellants.

C. Michael Haines, Deputy General Counsel, Office of Legal Counsel, Kentucky Natural Resources & Environmental Protection Cabinet, Frankfort, Eugene L. Mosley, Ackerson, Mosley & Yann, Louisville, KY, Neal R. Brendel, James R. Segerdahl, Christopher C. French, Kirkpatrick & Lockhart LLP, Anne Courtney Coorssen, Westinghouse Electric Corporation, Law Department, Pittsburgh, PA, Richard M. Sullivan, Edward F. Busch, Kenneth A. Bohnert, Conliffe, Sandmann & Sullivan, Irvin D. Foley, Foley, Bryant & Holloway, Louisville, KY, M. Murphy, Kenneth G. Schuler, Latham & Watkins, Chicago, IL, Counsel for Appellees.

Opinion of the Court by Justice SCOTT.

This appeal is from the judgment of the Court of Appeals, affirming the decision of the Jefferson Circuit Court, except on the jury instruction issue of fortuity. The Court of Appeals reversed on the issue of fortuity and remanded the matter for a new trial consistent with their opinion.

Six separate issues were raised on appeal and cross-appeal by the various parties. These include: (1) whether the Court of Appeals erred in setting aside the jury verdict; (2) whether ANI should be required to reimburse the insureds for the costs of participating in the CERCLA action; (3) whether the costs of site measures are paid "as damages because of property damages" within the meaning of the ANI policies; (4) whether exclusion (f) applies and therefore precludes coverage; (5) whether ANI's policies cover the defense costs incurred in this action; and (6) whether the ANI policies were triggered for the full amount of the limits in effect at any time the property damage at issue was caused without pro-rating the liability.

We shall address all six issues argued, but first set forth the following summary of facts, taken largely from the list of sixty-eight stipulations compiled by the parties and the Court of Appeals Opinion:

Maxey Flats is a chemical and nuclear waste disposal facility located in eastern Fleming County which accepted waste from 1963 to 1977. Over this time period, approximately 4.75 million cubic feet of low-level radioactive waste was received and buried at the Maxey Flats facility. The waste originated from power plants, hospitals, universities, various industries, and government installations. Most of the waste transported to the Maxey Flats fa-

cility consisted of solid materials that were deposited in containers constructed of various materials including cardboard, wood and steel. Liquid wastes, including tritium, were also accepted at Maxey Flats from 1963 to 1972. Both solid and liquid radioactive waste was buried in trenches at Maxey Flats.

The use of trenches to bury waste was a permissible practice for disposing of low-level radioactive waste during the time period the Maxey Flats facility was open for the receipt of commercial waste.

Unfortunately, rain water penetrated the large, unlined trenches, mixed with the radioactive waste, and leached out underneath the trenches and beyond the facility.

In December, 1977, the Commonwealth of Kentucky ("Commonwealth"), as the primary regulatory authority with respect to the use and disposal of radioactive material in Kentucky, became alarmed at the level of radioactive contaminants migrating off-site. Accordingly, it issued an order suspending the facility's license to accept additional waste. Thus, no commercial waste was received at the Maxey Flats facility after December 1977.

Atcor, Inc., Chem–Nuclear Systems, Inc. ("Chem–Nuclear") and Hittman Nuclear & Development Corporation ("Hittman") were in the business of transporting and/or arranging for the transportation of low level radioactive waste to licensed waste disposal sites throughout the United States. Hittman was acquired by Westinghouse Electric Corporation in 1982. In 1984, the name of the corporation was changed to Westinghouse Hittman Nuclear Incorporated.

Atcor and Chem–Nuclear never owned or operated the Maxey Flats facility. Neither Hittman, Westinghouse Electric Corporation nor Westinghouse Hittman Nuclear Incorporated (collectively "Hittman") owned or operated the Maxey Flats facility while it was open and accepting commercial waste.

Aetna Casualty and Surety Company, and the other involved insurance companies (36 companies altogether) are members of the American Nuclear Insurers, or "ANI." ANI is an unincorporated underwriting association, formed by conventional insurance carriers, which issues nuclear liability insurance policies.

ANI issued Policy NF–48 (FACILITY FORM) to U.S. Ecology (successor to NECO, original licensee of the Maxey Flats facility), the Commonwealth and Hittman corporation. These insureds purchased the ANI Facility Form to insure against nuclear energy hazard liability arising out of the ownership or operation of the Maxey Flats facility. The policy defines "Insured" broadly to include not only the named insured, but "any other person with respect to his legal liability for damages because of . . . property damage caused by the nuclear energy hazard."

ANI also issued separate "Supplier & Transporters Form" insurance policies ("S & T" Forms) to Chem–Nuclear, Atcor and Hittman Nuclear and Development Corporation. These policies provide coverage for nuclear energy hazard liability arising out of their waste transportation activities.

In 1986, the Environmental Protection Agency ("EPA") placed the Maxey Flats facility on the National Priorities List. Pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C § 9601 et seq., the EPA instituted administrative proceedings against the insureds for the cleanup of the contaminated site and the abatement of the effects of the contamination. The initial step in such proceedings took place November 26, 1986 when the EPA sent notices by certified mail to approximately 832 Potentially Responsible

Parties ("PRPs") who had owned or operated the Maxey Flats facility, or who had transported or arranged for the transportation of waste to the facility. These entities included Atcor, Chem–Nuclear, U.S. Ecology, the Kentucky Natural Resources and Environmental Protection Cabinet and Westinghouse Electric Corporation on behalf of Hittman.

When the insureds notified ANI of the EPA's PRP notices, ANI refused to defend or indemnify them in the CERCLA action. Therefore, the insureds were forced to deal with the EPA on their own. Subsequently, in 1987 the PRPs agreed to a consent order with the EPA obligating them to perform a "Remedial Investigation and Feasibility Study" ("Feasibility Study") to determine the nature and extent of the property damage, and to evaluate alternative remediation programs for its correction or containment. The study was completed at a cost of over $5,000,000. Following submission of the Feasibility Study, the EPA issued a Record of Decision which incorporated parts of this Feasibility Study in a clean-up remedy for the insureds to implement at Maxey Flats. The remedial plan had an estimated cost of implementation in excess of $57,000,000. The insureds ultimately settled the EPA's claims and the settlement is contained in a consent decree filed with the United States District Court for the Eastern District of Kentucky in July 1995.

Meanwhile, in April 1987, ANI, having refused to defend, filed a declaratory judgment action in the Jefferson Circuit Court seeking to establish no coverage liability. Counterclaims were made by the insureds for coverage under the policies and money damages for ANI's breach of contractual duties to defend and indemnify them.

Following discovery, all parties filed cross-motions for summary judgment. On January 4, 1995, the Jefferson Circuit Court entered a partial summary judgment in favor of the insureds, holding (1) the response costs required to remediate the site were "damages" within the meaning of the policy and (2) the contamination of off-site property constituted "property damage" as defined by the policies. Thereafter, the Court summarily ruled that ANI's duty to defend the appellees had been triggered by the EPA's notice of CERCLA proceedings (the PRP notice letters).

ANI's defense to coverage, applicable to the Commonwealth and U.S. Ecology, the "fortuity defense," proceeded to trial in June 1997. "Fortuity" is the principle that an insured cannot have coverage for those things that are "expected or intended" from the covered conduct. *See, e.g., James Graham Brown Foundation v. St. Paul Fire & Marine Ins. Co.,* 814 S.W.2d 273 (Ky.1991). The jury found these appellees were precluded from recovery under the "Facility Form" since their share of the remediation costs were "expected, intended, anticipated or foreseen" in the ordinary course of operating the facility under regulatory compliance.

The Court of Appeals affirmed the circuit court's summary judgment ruling, but held the Commonwealth was entitled to a new trial on the issue of "fortuity" due to erroneous jury instructions. This Court granted discretionary review.

**a.  *Whether the Court of Appeals erred in setting aside the jury verdict***

By order dated March 3, 1997, the Jefferson Circuit Court allowed the "fortuity" defense to proceed to jury trial. Originally, this defense potentially applied to the comprehensive general liability policies held by several of the insureds. However, prior to trial ANI had reached a settlement with all but the Commonwealth and U.S. Ecology.

Appellants, ANI, argue the Court of Appeals erred in setting aside the jury verdict on the issue of fortuity. They cite what they contend are multiple errors by the Court, including (1) the Court of Appeals ignoring the fact that the trial court correctly instructed the jury at the close of trial on the issue that had been tried to the jury by agreement of the parties, (2) the Court of Appeal's finding that the Commonwealth had preserved the objection to the instructions as required by CR 51(3), and (3) the Court of Appeal's holding that the trial court's instructions were erroneous in light of this Court's decision in *Brown Foundation, supra.*

■ To address these arguments, we state first that we agree with ANI and the Court of Appeals that the requirement that loss be fortuitous, *i.e.* not intended, is a concept inherent in all liability policies. Fortuity "must be judged using a subjective standard, because requiring this knowledge element best serves the overall principle of insurance law." *Aetna Cas. & Sur. Co. v. Dow Chemical Co.*, 10 F.Supp.2d 771, 789 (E.D.Mich.1998) (internal quotes and citations omitted). "The crucial issue is whether [the insured] was aware... of an immediate threat of the [injury] for which it was ultimately held responsible and for which it now seeks coverage, not the [insured's] awareness of its legal liability for that [injury]." *Id.* at 790.

■ Second, we dispel ANI's argument that the Commonwealth waived any error with respect to the jury instructions by its submission of a proposed instruction substantially similar in form to that actually tendered to the jury. The Commonwealth offered two alternate instructions regarding fortuity before the close of the trial. And as the process for developing jury instructions continued throughout the trial, the Commonwealth's late offering of its preferred fortuity instruction does not hinder its ability to argue on appeal that such an instruction was proper.

We find the Commonwealth properly preserved its objection to the given jury instruction, which improperly focused on the "fortuity of the response costs (damages), instead of the fortuity of the harm (property damage)," by its offer of an alternative instruction incorporating its position, which was substantively opposite from that the court chose to give. CR 51(3) allows an offered instruction as one method to preserve a party's objection to an offering or failure to offer an instruction.

■ We also find the Commonwealth's proffered instruction to more accurately state the law as spoken to in *Brown Foundation, supra.* In *Brown Foundation,* this Court addressed the issue of fortuity regarding a claim for insurance coverage. The case mirrors the case at hand in that it involved insureds seeking coverage to pay for an environmental cleanup ordered by the EPA pursuant to CERCLA. We held the Foundation was entitled to coverage under its policies unless it had specific and subjective intent to cause the pollution giving rise to the CERCLA claims. Equating the reasoning of *Brown* to the case at hand, the Commonwealth is entitled to insurance coverage unless it specifically and subjectively intended to cause the migration of radioactive contamination.

Therefore, we affirm the Court of Appeal's finding of reversible error due to the giving of an erroneous jury instruction, which we believe misled the jury on the issue of fortuity.

**b. *Whether ANI should be required to reimburse the insureds for the costs of participating in the EPA Administrative Process***

■ Appellants, ANI, argue they should not be required to reimburse appellees for

the costs of participating in the CERCLA proceedings because (1) the policy language provides that ANI will defend a "suit," not an administrative notice, and (2) neither public policy considerations, nor the insureds' reasonable expectations, require ANI to provide a defense to the CERCLA proceedings.

Appellees, Westinghouse Hittman Nuclear Incorporated and Hittman Nuclear & Development Corporation (collectively referred to as "Hittman") and Atcor, Inc. and Chem–Nuclear Systems, Inc. (collectively referred to as "Chem–Nuclear"), (position also adopted by Commonwealth Ecology) argue the CERCLA proceedings constitute a "suit" requiring ANI to defend.

Both the "Facility" and "S & T" policies issued by ANI provide the insurers will "defend any suit against the insured alleging ... bodily injury or property damage and seeking damages which are payable under the terms of the policy; but the companies may make such investigation, negotiation or settlement of any claim or suit as they deem expedient." The policies do not define the term "suit" or "claim."

ANI relies on *Foster–Gardner, Inc. v. National Union Fire Ins. Co.*, 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265 (1998), and various other cases from other jurisdictions, for the proposition that an administrative order directing an insured to take remedial action to clean up pollution is not a "suit" triggering a duty to defend. The Court of Appeals expressly rejected this "bright line" approach, distinguishing suits from claims, because it believed this approach disregards the doctrine of reasonable expectations.

■ The rule of interpretation known as the "reasonable expectations doctrine" resolves an insurance policy ambiguity in favor of the insured's reasonable expectations. *True v. Raines*, 99 S.W.3d 439, 443

(Ky.2003). As we agree with the Court of Appeals that the term "suit" is susceptible of more than one interpretation, an ambiguity exists as to what actions or processes the term "suit" describes. And thus, such ambiguity must be resolved in favor of the insured's reasonable expectations.

■ We believe "an insurance company should not be allowed to collect premiums by stimulating a reasonable expectation of risk protection in the mind of the consumer, and then hide behind a technical definition to snatch away the protection which induced the premium payment." *Moore v. Commonwealth Life Ins. Co.*, 759 S.W.2d 598, 599 (Ky.App.1988)(internal citations omitted).

Therefore, we would not allow ANI to avoid their duty to defend the insureds in this instance by clinging to an archaic definition of "suit." In this, we are persuaded by the reasoning in *Johnson Controls, Inc. v. Employers Insurance of Wausau*, 264 Wis.2d 60, 665 N.W.2d 257 (2003), wherein the Wisconsin Supreme Court held:

> [an][i]nsured's receipt of a potentially responsible party (PRP) letter from the Environmental Protection Agency (EPA) or an equivalent state agency seeking remediation or remediation costs is a "suit" which a comprehensive general liability (CGL) insurer has a duty to defend...; it is the functional equivalent of a suit and marks the beginning of adversarial administrative legal proceedings that seek to impose liability upon an insured, and a reasonable person in the position of the insured would expect the insurer to provide a defense.

*Id.* at 285.

The existence of a statutory system designed to forgo litigation, while achieving the same relief, minimizes the distinction between administrative claims and formal

legal proceedings. *See Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1517 (9th Cir.1991). "Coverage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation." *Id.* at 1517.

For the reasons outlined above, we affirm the Court of Appeal's finding that ANI is required to reimburse the insureds for their costs in participating in the EPA administrative process.

**c. *Whether the costs of site measures are paid "as damages because of property damages" within the meaning of the ANI policies.***

Appellants, ANI, argue the costs of site measures are not paid "as damages because of property damage." They contend: (1) none of the insureds' Maxey Flats response cost liability was spent to compensate third parties for a "compensable loss;" (2) no third party has "sued" any of the insureds alleging bodily injury or property damage to its property because of the nuclear energy hazard at Maxey Flats; and (3) the CERCLA liability was imposed for purely "prophylactic" measures for which ANI's policies do not provide coverage.

Appellees, Hittman and Chem–Nuclear (position also adopted by Commonwealth) argue the response costs at issue are damages for three reasons: (1) the plain and ordinary meaning of the term "damages" encompasses any monetary liability for property damage, without regard to the form of action in which the liability is imposed, (2) 15 of 17 state supreme courts that have addressed this issue have held that legally mandated environmental remediation costs are "damages," and (3) the term "damages" is at least ambiguous and must be construed in favor of coverage.

In its policies, ANI promises "to pay on behalf of the insured . . . all sums which the insured shall become legally obligated to pay as damages because of . . . property damage caused by the nuclear energy hazard."

CERCLA expressly permits responsible parties to insure against the costs of relief under this legislation. See 42 U.S.C. § 9607(e). Therefore, our task is to decide whether ANI's policies do provide coverage according to their terms despite "damages" being undefined within the policy language.

As such, our reasons for affirming the Court of Appeal's decision that the cost of site measures are "damages because of property damage" mimic our considerations and reasoning regarding the prior issue of EPA proceedings being the functional equivalent of a suit.

■ As damages are not defined within ANI's policies, and various authorities from dictionaries to court opinions define the term to encompass diverse aspects of monetary awards, we find the term ambiguous and subject to the reasonable expectations of the insureds.

■ We believe the policy language, "all sums which the insured shall become legally obligated to pay as damages because of property damage," can reasonably be interpreted to cover any claim asserted against the insured arising out of property damage, which requires the expenditure of money, regardless of whether the claim can be characterized as legal or equitable in nature. This interpretation is supported by the dictionary definition of "damages" which makes no distinction between damages at law and actions in equity. See Webster's Third New International Dictionary 571 (P. Gove ed.1961).

We agree with the majority of state appellate courts that hold the ordinary meaning of "damages" is broad enough to,

and does include, government mandated response or cleanup costs under CERCLA and similar state environmental protection statutes: as long as the purpose is to rectify, correct, control, lessen or stop ongoing injury of the premises. This purpose is met in this action.

We are further persuaded by the reasoning of the Wisconsin Supreme Court in *Johnson Controls, Inc. v. Employers Insurance of Wausau*, 264 Wis.2d 60, 665 N.W.2d 257 (2003), wherein the Court explained:

> the nature of relief in CERCLA response cost actions is not confined to future injuries; it includes legal recompense for injuries sustained.... Thus, there is both a prospective and remedial element to an insured's response cost liability. Because CERCLA proceedings seek the costs of repairing damaged property, rather than the cost of conforming one's future conduct, the nature of the relief is, at least in part compensatory.

*Id.* at 274.

The Sixth Circuit Court of Appeals has also explained its interpretation of the term "damages" in the case of *Anderson Development Co. v. Travelers Indem. Co.*, 49 F.3d 1128 (6th Cir.1995), wherein the Court wrote:

> The fact that the insured cooperates and assumes the obligation to conduct the clean-up, rather than forcing the EPA to incur the expenses of a clean-up and then bring a coercive suit, does not change the bottom line that a legal obligation exists. Accordingly, we... hold... government imposed environmental clean-up costs constitute "damages."

*Id.* at 1133.

We would add, also, that if ANI intended a narrow technical definition of "dam-ages," it was their duty to define the term clearly within their policies. See *Minnesota Min. & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 181 (Minn.1990).

■■■ The second question we must answer before concluding ANI's policies provide coverage for the cost of site measures incurred by the insureds, is whether these costs are "damages because of property damage" within the meaning of the policies.

Unlike standard form general liability policies, ANI's policies expressly define "property damage" to include "radioactive contamination" and also contemplate within the definition, the "imminent danger of such contamination." Because radioactive contamination of property has unquestionably occurred at, in, and around Maxey Flats, we find "property damage" has occurred as the term is defined within the policies.

We think the trial court explained its reasoning well when it wrote:

> The EPA response costs were triggered by, and can be seen by the ordinary insured to have been imposed "because of" the radionuclide levels which were discovered on the adjacent property. Since the radionuclide levels on the adjacent property triggered the liability, they were "property damage" from the standpoint of the insureds. The ambiguity of the provision allows nontechnical construction, and application in the insureds' favor.

Thus, we affirm the Court of Appeal's decision that the insureds' costs of site measures are "damages because of property damage" as defined within ANI's policies.

d. *Whether exclusion (f) applies and therefore precludes coverage*

■■■ The ANI "Facility" and "S & T" policies contain what are referred to as

"Facility Exclusions" that preclude coverage for property damage to Maxey Flats. ANI's Facility Form Exclusion (f) provides that coverage does not apply "to property damage to any property at the location designated in [Maxey Flats], other than aircraft, watercraft or vehicles licensed for highway use, provided such aircraft, watercraft or vehicles are not used in connection with operation of the facility."

The ANI S & T Forms NS–230 and NS–266, at Exclusion f, state that those policies do not apply "to property damage to any property at any nuclear facility or any property threat arising out of the possession, handling, use, storage or disposal of nuclear material at such nuclear facility. . . ."

Kentucky law mandates that exclusions in insurance policies should be narrowly construed as to effectuate insurance coverage. See *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859 (Ky.1992). We find in accordance with the Court of Appeal's opinion that the weight of authority favors coverage under liability policies for remediation expenses when the primary intent is to prevent additional harm to the property of others or to public waters. See, e.g., *Intel Corporation v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551 (9th Cir.1991); *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023 (2d Cir.1991). We recognize also that common sense would mandate in this scenario the most effective method of preventing additional harm to the property of others or to public waters would be to target the site of the harm, though it may be on-site, to prevent further contamination via run off to off-site locations.

Plus, we find the parties stipulation that only 2.6% of the total response costs were designed to clean up damage confined to the insured facility determinative of our decision whether exclusion (f) applies to

exclude ANI's liability for the insureds' response costs. Accordingly, we affirm the lower court's finding that only 2.6% of the response costs are subject to exclusion (f), a ruling undisturbed by the Court of Appeal's opinion.

**e.** *Whether ANI's policies cover the defense costs incurred in this action.*

Cross-appellants, Hittman and Chem–Nuclear, (position also adopted by Commonwealth) argue the Court of Appeals erred in enforcing the provision contained in both the "Facility" and "S & T" policies which includes (or offsets) defense costs within the policies limits. The insureds also argue they are entitled to recover their attorney's fees incurred in the declaration action brought by cross-appellees, ANI.

■ The "Facility" and "S & T" Forms of the Nuclear Energy Liability Policy both contain the following expense offset provision, titled: *Limit of Liability: Termination of Policy Upon Exhaustion of Limit*, which states, in part:

> the limit of the companies' liability stated in the declarations is the total liability of the companies for their obligations under this policy and the expenses incurred by the companies in connection with such obligations, including. . .payments for expenses incurred in . . .defense of any claim or suit, including. . . attorneys' fees and disbursements. . . . *Each payment made by the companies in discharge of their obligations under this policy or for expenses incurred in connection with such obligations shall reduce by the amount of such payment the limit of the companies' liability under this policy.*

Regarding offset of the defense costs, the Court of Appeals reasoned absent a finding of bad faith on the part of an insurer, a breach of its obligation to defend

the insureds does not provide for a rewriting of the policy contract to award the insured more coverage than it purchased. We disagree with the Court of Appeal's reading of the contract.

It is the Opinion of this Court that all of the cross-appellants' Maxey Flats defense costs are now "damages" to be paid by cross-appellees, ANI; Not payments made directly by ANI "in discharge of their obligations under this policy or for expenses incurred in connection with such obligations. . . ." We are not disposed to expand the meaning of "payments made in discharge of their obligations under the policy," or "expenses incurred in connection with such obligations" to include payment of damages under compulsion. Anyway one reads the contested policy language, it requires voluntary payments by the companies in furtherance of the contractual obligations under the policy; not "litigated" damages for failure to honor the policy terms.

If ANI had paid attorneys' fees and expenses in defense of the insureds in the EPA CERCLA action, they would be entitled to offset such "payments for expenses incurred in defense of any claim or suit" as their policies directly provide. However, this policy language does not encompass "damages paid, or to be paid" for a breach of the contract.

■■■■ As argued by cross-appellants and supported by Kentucky law, an insurer has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage terms of the insurance policy. James Graham *Brown Foundation v. St. Paul Fire & Marine Insurance Co.*, 814 S.W.2d 273, 279 (Ky.1991)(internal citations omitted). If the insurer believes there is no coverage, it has several options. One is to defend the claim anyway, while preserving by a reservation of rights letter its right to challenge the coverage at a later date. Another is to elect not to defend. However, should coverage be found, the insurer will be liable for "all damages naturally flowing from" the failure to provide a defense. See *Eskridge v. Educator and Executive Insurers, Inc.*, 677 S.W.2d 887 (Ky.1984). This includes "damages" for reimbursement of defense costs and expenses if the insured hires his own lawyer, and in some instances, the amount of a default judgment, if he does not. cf., *Grimes v. Nationwide Mutual Insurance Company*, 705 S.W.2d 926 (Ky. App.1985).

In line with the reasoning of *Eskridge* and *Grimes*, we find the defense costs expended by cross-appellants in the CERCLA action, for which ANI owed a duty to defend, are damages to be paid them, and even though measured by the cost of such defense as owed, are not deductible, or to be offset, from ANI's liability policy limits. We note also that should this Court have determined a lack of coverage existed regarding the EPA proceeding, ANI would still have owed a duty to defend the insureds in the EPA action, because we believe the EPA's Potentially Responsible Parties notice letter contained allegations which "potentially, possibly or might" be considered to indicate "property damage" within ANI policies' scope of coverage. Therefore, ANI owed a duty to defend, regardless of whether they were later adjudicated to owe a duty to pay.

■■■■ We also agree with cross-appellants' argument that if ANI were allowed to invoke the above quoted provision from their liability policy, they would not suffer any adverse consequences as a result of their breach of duty to defend. There would be no incentive to review the contractual language carefully, as there would be no consequences. Therefore, public policy is another incentive to find in favor

of the Cross–Appellants on this issue. An insurer should not stand to gain from its denial to defend its insured.

■ The second sub-issue regarding attorneys' fees involves the insureds' claim that the Court of Appeals erred in refusing to allow them recovery of their attorneys' fees incurred in the declaratory judgment action initiated by ANI. With this contention, we cannot agree.

■ The Court of Appeals correctly stated the general rule in Kentucky that, "with the exception of a specific contractual provision allowing for recovery of attorneys' fees or a fee-shifting statute, . . . each party assumes responsibility for his or her own attorneys' fees," citing *Nucor Corp. v. General Electric Co.,* 812 S.W.2d 136 (Ky. 1991).

We are still in agreement with the holding in *Nucor,* and therefore, affirm the Court of Appeal's decision not to allow cross-appellants recovery of their attorneys' fees in the declaratory judgment action.

f. *Whether the ANI policies were triggered for the full amount of the limits in effect at any time the property damage at issue was caused without pro-rating the liability*

■ In its cross-appeal, Westinghouse Hittman Nuclear Incorporated and Hittman Nuclear & Development Corporation (collectively referred to as "Hittman"), argue the Court of Appeals erred in affirming the trial court's decision to pro-rate the amount of insurance available to cover its losses. Cross-appellees, ANI, argue the ANI policies were not triggered for the full amount of the limits. They believe the circuit court correctly allocated the damage over time periods and then correctly applied the policy limits in effect during that time period to the amounts so allocated.

The trial court held that the cause of the property damage on and off Maxey Flats was ongoing and continuous during the various policy periods. Therefore, the Trial Court pro-rated coverage since the damage was not divisible or allocable during and between the policy periods.

We adopt the reasoning of the Court of Appeal's opinion regarding this issue of pro-ration as we agree that Hittman's cited authorities do not carry their proclaimed weight when dealing with the instant case involving one insurer, a single liability policy (the "Facility" Form) and a single excess policy (the "S & T" policy). As such, we affirm the Court of Appeal's decision on this issue.

LAMBERT, C.J., GRAVES, JOHNSTONE and WINTERSHEMINER, JJ., concur.

COOPER, J., dissents by separate opinion with ROACH, J., joining that opinion except for its reliance on Section 2 of the Constitution of Kentucky.

COOPER, Justice, dissenting in part.

I dissent from the majority opinion because (1) the insurance policies issued by American Nuclear Insurers (ANI) are third-party liability policies that do not provide coverage either for property damage to the insured site or for capital improvements to the site itself (referred to as "site measures"); (2) the trial court properly instructed the jury on the issue of fortuity and the jury's verdict on that issue would preclude ANI's liability with respect to the Commonwealth of Kentucky and U.S. Ecology even if coverage otherwise existed; and (3) ANI was not required to provide a defense to the administrative agency proceedings initiated by the Environmental Protection Agency (EPA) pursuant to CERCLA; but even if that were not so, the majority opinion violates Sec-

tion 2 of our Constitution by rewriting the parties' contract with respect to the costs and fees incurred in that defense, thereby impairing obligations of contract and, *sua sponte*, imposing the equivalent of potentially massive punitive damages.

## I. THE INSURANCE POLICIES.

ANI issued two policies of liability insurance with respect to the Maxey Flats nuclear waste disposal site, each titled "Nuclear Energy Liability Policy," with one subtitled "Facility Form" and the other subtitled "Supplier's and Transporter's Form" ("S & T Form"). The Facility Form provides underlying coverage for liability arising out of the ownership or operation of the Maxey Flats site. The named insureds of the Facility Form are the Commonwealth, Natural Resources and Environmental Protection Cabinet (NREPC), U.S. Ecology, and Westinghouse, all of whom either owned, operated, or monitored Maxey Flats at one time or another. (Westinghouse also transported waste to Maxey Flats.) The S & T Form provides excess coverage for waste haulers in the event the lessee/operator of a particular waste disposal facility is underinsured. There are actually two S & T Form policies applicable to this case, one issued to Chem–Nuclear and Atcor and the other issued to Westinghouse.

The Facility Form contains the following relevant provisions with respect to coverage:

BODILY INJURY AND PROPERTY DAMAGE LIABILITY. To pay on behalf of the insured:

(1) all sums which the *insured* shall become legally obligated to pay *as damages* because of bodily injury or *property damage* caused by the nuclear energy hazard, and the companies *shall defend any suit* against the insured alleging such

bodily injury or property damage and *seeking damages which are payable under the terms of this policy;* but the companies *may* make such investigation, negotiation and settlement of any *claim or suit* as they deem expedient;

. . .

DEFINITION OF INSURED. The unqualified word "insured" includes (a) the named insured and (b) *any other person or organization with respect to his legal responsibility for damages* because of bodily injury or property damage *caused by the nuclear energy hazard.*

. . .

Subject to Condition 3 ["Limit of Liability"] and the other provisions of this policy, *the insurance applies separately to each insured against whom claim is made or suit is brought.*

DEFINITIONS. Wherever used in this policy:

. . .

"property damage" means physical injury to or destruction or radioactive contamination of property, and loss of use of property so injured, destroyed or contaminated, and loss of use of property while evacuated or withdrawn from use because possibly so contaminated or because of imminent danger of such contamination . . . .

EXCLUSIONS.

This policy does not apply:

. . .

(f) to property damage to any property at the location designated in Item 3 of the declarations [Maxey Flats site]

. . .

CONDITIONS.

3. LIMIT OF LIABILITY; TERMINATION OF POLICY UPON EX-

HAUSTION OF LIMIT. *Regardless of the number of persons and organizations who are insureds under this policy, and regardless of the number of claims made and suits brought against any or all insureds* because of one or more occurrences resulting in bodily injury or property damage caused during the policy period by the nuclear energy hazard, *the limit of the companies' liability stated in the declarations is the total liability* of the companies for their obligations under this policy and the expenses incurred by the companies in connection with such obligations, including

(a) *payments in settlement of claims and in satisfaction of judgments* against the insureds for damages because of bodily injury or property damage . . . .

(b) *payments for expenses incurred* in the investigation, negotiation, settlement *and defense* of any claim or suit, including, but not limited to, the cost of such services by salaried employees of the companies, fees and expenses of independent adjusters, *attorneys' fees* and disbursements, expenses for expert testimony, inspection and appraisal of property, examination, X-ray or autopsy or medical expenses of any kind . . . .

*Each payment made by the companies in discharge of their obligations under this policy or for expenses incurred in connection with such obligations shall reduce by the amount of such payment the limit of the companies' liability under this policy.*

If, during the policy period or subsequent thereto, the total of such payments made by the companies shall exhaust the limit of the companies' liability under this policy, all liability and obligations of the companies under this policy shall thereupon terminate . . . .

Regardless of the number of years this policy shall continue in force and the number of premiums which shall be payable or paid, the limit of the companies' liability stated in the declarations shall not be cumulative from year to year.

(Emphasis added.)

The S & T Form contains the same language as the Facility Form with respect to bodily injury and property damage liability, the definition of "property damage," and the limit of liability (Condition 3). However, it confines its coverage only to the named insureds and its "Exclusion (f)" reads as follows:

EXCLUSIONS.

This policy does not apply:

. . .

(f) to property damage to *any nuclear facility or any property threat* arising out of the possession, handling, use, storage or disposal of nuclear material at such nuclear facility . . . .

(Emphasis added.)

All of these policies are third-party liability policies that pay on behalf of the insureds *damages* arising out of *damage* to property owned by others caused by activities on the insured site, *e.g.,* migration of radionuclides from the insured site to other properties. Because they specifically exclude coverage for property damage to the insured site, itself, and do not purport to pay for capital improvements to the insured site, they are not first-party policies. *Allstate Ins. Co. v. Dana Corp.,* 759 N.E.2d 1049, 1054 (Ind.2001) ("Because there is no liability coverage for damage to Dana's own property, reference to the 'owned property' exclusion in these policies is unnecessary."). First-party policies,

sometimes referred to as "Differences in Conditions" (DIC), "All Risks,"[1] or Casualty Insurance policies, are conceptually similar to collision coverage in a standard automobile policy or fire coverage in a standard homeowner's policy.

Third party insurance involves protection for the policyholder for liability it incurs to someone else, while first party insurance involves protection for losses to the policyholder's own property. Generally, a CGL [Comprehensive General Liability] policy insures against injury or damage to a third party; the insurer agrees to defend and indemnify the insured against liability for risks identified in the policy. A DIC [Differences in Conditions] policy, by contrast, is generally a first-party insurance policy that indemnifies the insured for damage to its own property.

*Aluminum Co. of America ["ALCOA"] v. Aetna Cas. & Sur. Co.,* 140 Wash.2d 517, 998 P.2d 856, 863 (2000) (applying Pennsylvania law and holding that ALCOA's DIC policies, but not its CGL policies, provided coverage for CERCLA clean-up costs incurred with respect to ALCOA's own property). *See also Bausch & Lomb Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 625 A.2d 1021, 1033 (1993) ("A hallmark of the comprehensive general liability policy is that it insures against injury done to a third party's property, in contradistinction to an 'all-risks' policy also covering losses sustained by the policy-holder.").

## II. MAXEY FLATS.

When it enacted the 1962 legislation that created the Kentucky Atomic Energy Authority and authorized the operation of nuclear and radioactive waste disposal sites,[2] the General Assembly recognized that there would be a continuing and perpetual need to maintain, repair, and improve the containment features of such sites. It assigned that responsibility to the Commonwealth.

It is recognized by the General Assembly that any site used as a radioactive waste material site will represent a *continuing and perpetual responsibility* in the interests of the public health, safety and general welfare, and that the same must ultimately be reposed in a sovereign government without regard for the existence or non-existence of any particular agency, instrumentality, department, division or officer thereof.

In the event the Authority shall acquire and dedicate one or more radioactive waste material sites, the Authority may convey such sites to the Commonwealth for no other consideration than an undertaking of the Commonwealth to maintain, safeguard and operate the same in the interests of the public health, safety and welfare. Any such conveyance may contain an express provision that the Commonwealth thereby assumes such continuing and perpetual responsibility, and the Commissioner of Health (or other officer succeeding to his functions) is hereby authorized to sign the same and bind the Commonwealth in that regard; and any such conveyance may be made subject to any existing contractual rights of licensees using source, by-product and special nuclear materials to make use of the site or sites in the disposition of radioactive waste materials.

---

1. For an example of an "All Risks" policy, *see California Union Ins. Co. v. Spade,* 642 S.W.2d 582 (Ky.1982).

2. 1962 Ky. Acts, ch. 100, codified at KRS 152.510, *et seq.,* repealed, except with respect to KRS 152.590, by 1964 Ky. Acts, ch. 7, § 12, 1976 Ky. Acts, ch. 299, § 91.

1962 Ky. Acts, ch. 100, § 19, codified at KRS 152.690, repealed 1978 Ky. Acts, ch. 279, § 9 (emphasis added). The Maxey Flats nuclear waste disposal site opened in 1963 under lease to Nuclear Engineering Co. (NECO). The lease was subsequently transferred to U.S. Ecology, Inc. Instead of purchasing, *e.g.*, a DIC policy to defray the cost of its "continuing and perpetual responsibility," the Commonwealth sought to build a fund for that purpose by charging "burial fees" to its lessees, who presumably passed those fees along to the waste haulers. *See* Lease between Kentucky Atomic Energy Authority and NECO, Jan. 21, 1963, at 4–6 (Pl.Ex. 49) and testimony of J. Scoville (deposition read at trial).

The Commonwealth closed the Maxey Flats site in 1977. A study completed shortly thereafter determined that the site did not pose a public health hazard but that there existed a "potential" for migration of radionuclides to adjacent properties. In 1980, the General Assembly enacted KRS 211.898, *viz*:

> The Natural Resources and Environmental Protection Cabinet shall proceed toward the stabilization and decommissioning of any nuclear waste facility owned by the Commonwealth on July 15, 1980 as expeditiously as is reasonably possible in order to place the facility in such a condition that active ongoing maintenance is eliminated and only surveillance and monitoring are required.

1980 Ky. Acts, ch. 17, § 4. However, when the NREPC undertook to perform this mandate, it discovered that the estimated cost of complying with it far exceeded the "burial fees" set aside for that purpose.

### III. THE CERCLA PROCEEDINGS.

The Commonwealth first sought additional funds from various federal agencies. It then vigorously and successfully sought to have Maxey Flats placed on the National Priority List (NPL) of the nation's most dangerous nuclear waste sites so as to qualify for "Superfunds" and possibly spread its liability to other "potentially responsible parties" ("PRPs"). *See* Letter from Governor Martha Layne Collins to Charles Jeter, Regional Administrator of the Environmental Protection Agency (EPA) (September 7, 1984) (Pl.Ex. 28) ("The purpose of this letter is to make you aware that the Maxey Flats site is the highest priority in Kentucky for Superfund planning and budgeting for FY 1985."); Letter from T. Michael Taimi, Commissioner, Kentucky Department for Environmental Protection, to Thomas W. Devine, Director of EPA's Air and Waste Management Division (August 23, 1984) (Pl.Ex. 26) ("This is to advise that the Commonwealth of Kentucky has expended serious effort to include the Maxey Flats site near Morehead, Kentucky on the next edition of the National Priority List (NPL).... [A]ssuming this site is placed on the NPL, Kentucky would like for this site to be considered as the number one priority for further investigation and feasibility."); Memorandum from Rose Marie Carr, Manager, Maxey Flats Branch, to T. Michael Taimi (January 14, 1985) (Pl.Ex. 27) ("The Department has been successful in having the Maxey Flats Nuclear Waste Disposal Site placed on the Superfund list.").

Placement of Maxey Flats on the NPL automatically triggered the administrative procedures required by the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601, *et seq.*, as supplemented by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99–499, 100 Stat. 1613. On November 26, 1986, the EPA issued PRP letters to 832 entities, ultimately trimmed to approximately 600, that had owned, operat-

ed, or sent waste to Maxey Flats. H. Doyle Mills and Caroline Patrick Haight, Kentucky Department for Environmental Protection, *Superfund Clean Up of a Commercial Radioactive Waste Disposal Facility in Kentucky* 2. Pursuant to CERCLA, the EPA offered the PRPs the opportunity to conduct their own Remedial Investigation/Feasibility Study (RI/FS) of the site. Eighty-two (82) PRPs, including Appellees, accepted the offer, formed a steering committee, and conducted and partially funded the RI/FS. (Most of the funding was provided by the Department of Energy and the Department of Defense, which were PRPs but not members of the steering committee.) On March 27, 1987, those who had accepted the EPA's offer executed an "Administrative Order By Consent," reflecting EPA's findings of fact and conclusions of law and setting forth the steering committee's RI/FS plan of action.

Upon receipt of their respective PRP letters, Appellees all demanded that ANI provide them with a "defense" to the CERCLA proceedings. The Commonwealth's demand was particularly ironic in view of the fact that the initiation of the proceedings was a direct result of the Commonwealth's own urgent requests that Maxey Flats be placed on the NPL so as to qualify for Superfund and PRP contributions to mitigate its preexisting liability under KRS 211.898. It succeeded. Now it claims that the CERCLA administrative proceeding was a "suit" against which ANI was required to defend it. In effect, the Commonwealth was more a plaintiff than a defendant in the CERCLA proceedings, since its position was that of a party attempting to lay off a portion of its existing liability onto other parties. ANI denied coverage for any potential on-site clean-up or site improvement costs and declined to provide a defense to the CERCLA proceedings. (Under the "any other person

or organization" clause of the Facility Form policy, each of the 832 original PRPs was a potential insured who, under the majority opinion's reasoning, was entitled to a "defense" to the administrative proceedings and indemnification for its pro rata share of the costs.)

In 1991, the EPA issued a Record of Decision (ROD) that confirmed the previous study's finding that "the site does not currently pose a threat to human health or the environment," but concluded that certain site measures should be undertaken because of a potential "*threat* to human health and the environment posed by the site *in the future* should these activities not be undertaken." *ROD Responsiveness Summary* 25 (emphasis added). The estimated cost of these measures was $33,500,000, *ROD Declaration Statement* 2, of which it is stipulated that 97.4% was attributable to site-improvement measures and 2.6% to clean-up measures. *None* of the measures included any off-site remediation or improvements. The NREPC, the other PRPs, and the federal agencies agreed on an apportionment of the cost of these measures. The NREPC and the other parties to this appeal now claim coverage under ANI's third-party liability insurance policies for the amounts they agreed to pay, claiming that the ROD was an award of "damages" for "property damage."

The majority opinion correctly notes that 42 U.S.C. § 9607(e)(1) expressly authorizes PRPs to insure against the costs of relief imposed under CERCLA. Presumably, that refers to the purchase of a policy providing first-party coverage, *e.g.*, a "Differences in Conditions" (DIC), "All Risks," or Casualty policy, and not a liability policy that provides only third-party coverage for damage to the property of another. As a condition of licensure as either a nuclear waste disposal facility or a

nuclear waste hauler, the licensee must maintain a policy of "public liability" insurance. 42 U.S.C. § 2210(a). In that respect, the United States Code defines "public liability" as "any legal liability arising out of or resulting from a nuclear incident ... *except ... claims for loss of, or damage to, or loss of use of property which is located at the site of and used in connection with the licensed activity where the nuclear incident occurs.*" 42 U.S.C.A. § 2014(w) (emphasis added). In other words, a licensee is required to carry a policy of third-party liability insurance under 42 U.S.C. § 2210(a) and has the option of carrying a policy of first-party insurance under 42 U.S.C. § 9607(e). Since the policies at issue in this case are "public liability" policies, they do not provide coverage for damage to the insured site per 42 U.S.C. § 2014(w).

## IV. COVERAGE.

### A. Clean-up Costs.

Exclusion (f) in the Facility Form excludes coverage for "property damage to any property at the location designated in Item 3," *i.e.*, Maxey Flats. Exclusion (f) in the S & T Form excludes coverage for "property damage to any nuclear facility" and for "any property threat." The "any nuclear facility" language obviously anticipates that some insured waste haulers will haul waste to more than one nuclear facility. The language includes the Maxey Flats facility and, in that respect, is identical to Exclusion (f) in the Facility Form. Both of these exclusions are akin to the "owned property" exclusion found in virtually all comprehensive general liability (CGL) policies and apply to the clean-up costs required by the EPA pursuant to CERCLA.

The majority opinion concedes that these exclusions preclude recovery of the clean-up costs. *Ante*, at 840. *Accord Yale*

*Univ. v. Cigna Ins. Co.*, 224 F.Supp.2d 402, 407 (D.Conn.2002) ("[E]ven assuming arguendo that the clean-up costs incurred by Yale were sums it was 'legally obligated to pay' 'as damages' pursuant to the directives, the plain language of the policies [referring to the 'owned property' exclusion] additionally require that such damages have been incurred *because of third-party property damage.*"); *Cedar Lane Invs. v. St. Paul Fire & Marine Ins. Co.*, 883 P.2d 600, 603 (Colo.Ct.App.1994) ("owned property" exclusion "unambiguously" barred coverage for an EPA-ordered clean-up of the insured's property); *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 498 S.E.2d 492, 495 (1998) ("Boardman cannot obtain coverage for the costs of remediation to its own property on grounds that the clean-up was state-ordered or because of a possible future threat to surrounding property."); *Hakim v. Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 675 N.E.2d 1161, 1166 (1997) ("Costs incurred for the sole purpose of remediating the Hakims' property are barred by the owned property exclusion of the policy."); *Martin v. State Farm Fire & Cas. Co.*, 146 Or.App. 270, 932 P.2d 1207, 1212–13 (1997) ("Whether the reason for cleaning up the pollution was to restore the property to its full value for the benefit of its owners or to comply with governmental regulations for the benefit of the public, the remediation occurred on Martin's 'own property' " and, thus, the cost thereof was "unambiguously exclude[d].").

### B. Site Measures.

#### (1) Threat of damage.

The site measures, *i.e.*, improvement of the site's containment features, were performed to alleviate the "threat to human health and the environment posed by the site in the future." *ROD Responsiveness*

*Summary* 25. Obviously, the exclusion in the S & T Form policy of "any property threat" excludes coverage for the cost of implementing the recommended site measures. Furthermore, "threatened harm" is not within the coverage of either policy. *State v. Signo Trading Int'l, Inc.*, 130 N.J. 51, 612 A.2d 932, 938 (1992) ("The policy's definition of property damage does not encompass 'threatened harm' even if that threat is 'imminent' and 'immediate.'"). In *W.M. Schlosser Co., Inc. v. Insurance Co. of North America*, 325 Md. 301, 600 A.2d 836 (1992), the insured made a claim for the cost of work done on his own property to prevent possible future damage to adjoining property.

> The insurance contract involved in this case is a Contractor's General Liability Policy. By its clear and unambiguous language, it is intended to protect the insured against claims made by others for damages the insured has a legal responsibility to pay. It is not an all risks or builder's risk policy. No claims were made by others as a result of any personal injury or property damage. Moreover, there was no occurrence within the meaning of the policy that caused damage to the persons or property of others. The action taken by Schlosser was intended to prevent the type of harm the policy would have covered, and no such harm in fact resulted.

*Id.* at 838–39. *See also E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 686 A.2d 152, 157 (Del.1996) ("Costs for remedial measures taken on the insured's property to prevent third party property damage are precluded from coverage under the operation of the owned property clause."); *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wash.2d 891, 874 P.2d 142, 150 (1994) (en banc) ("[P]reventive measures taken before pollution has occurred are not costs incurred because of property damage.") (internal citation and quotation omitted).

The majority opinion's reliance on *Intel Corp. v. Hartford Accident & Indemnity Co.*, 952 F.2d 1551 (9th Cir.1991), and *Gerrish Corp. v. Universal Underwriters Insurance Co.*, 947 F.2d 1023 (2nd Cir. 1991), is misplaced. Those cases only exemplify a narrow exception to the general rule that is applied by some jurisdictions when pollutants from the insured property have already damaged adjacent properties, thus triggering the third-party liability coverage of the insured's policy. In that circumstance, the liability insurer may be required to pay damages not only for the damage to the adjacent owner's property but also for measures required to mitigate additional damage from the same cause. *Intel*, 952 F.2d at 1566 ("[I]t would seem strangely incongruous to the insured that his policy would cover him for damages to tangible property destroyed through his negligence in allowing a fire to escape but not for sums incurred in mitigating such damages by suppressing the fire.") (quoting *Globe Indem. Co. v. People*, 43 Cal. App.3d 745, 118 Cal.Rptr. 75, 79 (1974) (internal citations and quotations omitted)); *Gerrish*, 947 F.2d at 1030–31. *See also Western World Ins. Co. v. Dana*, 765 F.Supp. 1011, 1015 (E.D.Cal.1991) ("Mitigation damages are only available to mitigate against the further occurrence of an *insured loss*. Costs incurred to remedy the soil contamination are not recoverable mitigation costs because the damage was confined to property owned by the insured and therefore did not constitute an insured loss.") (internal citation and quotation omitted); *City of Laguna Beach v. Mead Reinsurance Corp.*, 226 Cal.App.3d 822, 276 Cal.Rptr. 438 (1990) ("Necessary to a recovery ... is the existence of an *insured loss*."); *E.I. du Pont*, 686 A.2d at 157 ("[T]he plain meaning of the language contained in the owned property exception

and the purpose of liability policies in general, both require the result that coverage not be provided for measures taken on an insured's property unless it is in response to damage to third party property."); *Signo Trading,* 612 A.2d at 939 ("[T]his case does not fall within the narrow exception allowing recovery for the cost of measures intended to prevent imminent or immediate future damage when a present injury has already been demonstrated."). "The policies require proof of actual harm to third-party property in order to 'eliminate[ ] any risk that insurance companies will be called upon to pay the ordinary costs of compliance with agency regulations.'" *Yale Univ.,* 224 F.Supp.2d at 408 (quoting *Metex Corp. v. Fed. Ins. Co.,* 290 N.J.Super. 95, 675 A.2d 220, 228 (1996)).

*(2) Property damage.*

It was asserted in the PRP letters and found by the trial court that some radionuclides had, in fact, migrated from the Maxey Flats site to adjacent property. The majority opinion characterizes that assertion as proof that " 'property damage' has occurred as the term is defined within the policies." *Ante,* at 839. However, the Department of Health regulations governing Maxey Flats authorized the migration of minimal amounts of radioactivity from the site so long as such releases did not exceed prescribed limits,[3] which, consistent with Kentucky's "Agreement State" status with the EPA, were identical to permissible discharge limits established under federal regulations.[4] The mere presence of radioactive particles on property does not *ipso facto* constitute "property damage." *Wilhite v. Rockwell Int'l Corp.,* 83 S.W.3d 516, 520–21 (Ky.2002).

I would note in passing that, while the PRP letters recited that elevated levels of radionuclides have been detected off-site and that studies have shown higher-than-normal tritium levels in trees adjacent to the site, the findings of fact in the Administrative Order By Consent prepared four months later recited only that elevated levels of radionuclides have been detected "on the site outside the restricted area." *In re Maxey Flats Nuclear Disposal Site,* U.S. EPA Docket No. 87–08–C, Finding of Fact D, at 3 (Envtl. Prot. Agency, Region IV, Mar. 24, 1987). None of the remediation or site measures involved any off-site clean-up or construction. As of this writing, the Maxey Flats nuclear disposal site has been closed for twenty-eight years and no adjacent property owner has yet made a claim for damages for property damage alleged to have been caused by migration of radionuclides from the site.

The majority opinion's citation to *Intel Corp. v. Hartford,* for the proposition that harm to public waters would constitute damage to a third-party, *ante,* at ——, is also misplaced. *Intel* did, indeed, hold that "[d]amage to *groundwater* is not damage to property 'owned or occupied by or rented to' Intel," 952 F.2d at 1565 (emphasis added); but, in doing so, it was construing California law providing that "[a]ll water within the State is the property of the people of the State." Cal. Water Code § 102. In Kentucky, underground percolating waters are owned by the surface owner, *Nourse v. Andrews,* 200 Ky. 467, 255 S.W. 84, 86 (1923), thus, any damage to percolating waters falls within the "owned property" exclusion. *Am. States Ins. Co. v. Hanson Indus.,* 873 F.Supp. 17, 24 (S.D.Tex.1995) (where groundwater is owned by the property owner, the owned property exclusion applies); *Boardman Petroleum,* 498 S.E.2d at 495 (same).

---

**3.** Ky. Dep't Health Reg. RH–4 §§ 7(b), 16 (1961); RH–4–1 §§ 7(b), 16 (1964).

**4.** 10 C.F.R. § 20.106 & App. B (1960).

There is no evidence that any seepage from the Maxey Flats site damaged or even threatened any surface waters.

### (3) "Damages."

The majority opinion attempts to satisfy the "damages" requirement of ANI's coverage provisions by likening the cost of the site improvement measures to "damages," because they were supposedly "ordered" by the EPA pursuant to CERCLA. *Ante,* at 839. However:

> "Damages," as distinguished from claims for injunctive or restitutionary relief, includes only payments to third persons when those persons have a legal claim for damages .... The general comprehensive liability policy between the parties covers "damages," but not the expenditures which result from complying with the directives of regulatory agencies.

*Md. Cas. Co. v. Armco, Inc.,* 822 F.2d 1348, 1352 (4th Cir.1987).

> [T]he insurer's duty to indemnify the insured for "all sums that the insured becomes legally obligated to pay as damages" under the standard comprehensive general liability insurance policy is limited to money ordered by a court.... For it is in a "suit" that "damages" are sought in some amount through the court's order.

*Certain Underwriters at Lloyd's of London v. Superior Court,* 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, 103–04 (2001). Improvements to one's own property, even at the behest of an administrative agency, are not "damages." The majority opinion resorts to Webster's dictionary to ascertain the ordinary meaning of damages. *Ante,* at 837. However, while "[v]iewed outside the insurance context, the term 'damages' is ambiguous ... the term 'damages' is not ambiguous in the insurance context and ... the plain meaning of the term 'damages' used in the CGL policies

refers to legal damages and does not cover cleanup costs." *Cont'l Ins. v. Northeastern Pharm. & Chem. Co.,* 842 F.2d 977, 985 (8th Cir.1988) (en banc) (construing Missouri law). *See also Grisham v. Commercial Union Ins. Co.,* 951 F.2d 872, 875 (8th Cir.1991) (same) (construing Arkansas law); *Mraz v. Canadian Universal Ins. Co., Ltd.,* 804 F.2d 1325, 1329 (4th Cir. 1986) (as evidenced by CERCLA provisions, response costs are an economic loss, not damages); *Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16, 18–19 (Me. 1990) ("There may be a substantial difference between these remedial costs and the amount of damages the Maroises would have to pay to property owners for damages to their property. It is the latter expenditure upon which the parties have contracted and upon which the insurance premium is based."); *Coakley v. Me. Bonding and Cas. Co.,* 136 N.H. 402, 618 A.2d 777, 784–85 (1992) (containment costs, including related investigatory costs, of insured's landfill were preventive in nature and not "damages," thus not covered by insured's CGL policy); *Weyerhaeuser,* 874 P.2d at 150 ("[T]he term 'damages' does not cover safety measures or other preventive costs taken in advance of any damage to property.").

The narrow construction of the term "damages" is consistent with the statutory scheme of CERCLA, which differentiates between clean-up costs and damages. Clean-up or response costs are recoverable by the government or by private parties. 42 U.S.C. § 9607(a)(4)(A), (B). *Additionally, the government may sue for "damages for injury to, destruction of, or loss of natural resources ...."* 42 U.S.C. § 9607(a)(4)(C). To date, most government actions have sought recovery of response costs, rather than damages.

*Verlan, Ltd. v. John L. Armitage & Co.,* 695 F.Supp. 950, 954–55 (N.D.Ill.1988) (emphasis added).

The majority opinion's reliance on *Anderson Development Co. v. Travelers Indemnity Co.,* 49 F.3d 1128 (6th Cir. 1995), and *Johnson Controls, Inc. v. Employers Insurance of Wausau,* 264 Wis.2d 60, 665 N.W.2d 257 (2003), is misplaced. Both cases involved only clean-up costs, not site-improvement measures. *Anderson,* 49 F.3d at 1132; *Johnson Controls,* 665 N.W.2d at 274–75. In fact, *Johnson Controls* opines that CERCLA gives the EPA *no authority* to order site-improvement measures to prevent future damage, but that such falls within the jurisdiction of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6992.

CERCLA does not regulate prospective conduct in the traditional sense that governments regulate commercial behavior. Rather, it seeks to impose strict liability on corporations and other entities for *damages to property done in the past.* None of the costs at issue in this case appear to have been incurred by Johnson Controls to improve the cleanliness of ongoing processing or to comply with government regulations requiring business practices conforming to some standard.[25]

---

[25] In fact, another federal statute, the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6992, which preceded CERCLA by a few years, regulates the present-day handling of hazardous wastes and carries its own enforcement mechanisms.

*Johnson Controls,* 665 N.W.2d at 274–75 (internal citations and quotations omitted). There is support for this proposition in *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996):

RCRA is a comprehensive environmental statute *that governs the treatment, storage, and disposal* of solid and hazardous waste. Unlike [CERCLA], RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards. RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, so as *to minimize the present and future threat* to human health and the environment.

*Id.* at 483, 116 S.Ct. at 1254 (emphasis added) (internal citations and quotations omitted). *Cf. Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.,* 920 F.2d 1415, 1422 (8th Cir.1990) (the "two ... main purposes of CERCLA" are "prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party"), *abrogated on other grounds by Key Tronic Corp. v. United States,* 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797; *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1041 (2d Cir.1985) ("CERCLA is not a regulatory standard-setting statute such as the Clean Air Act.").

In summary, the cost of the site-improvement measures is not within the coverage of the ANI policies because they were not sums that the insureds were "legally obligated to pay as damages because of ... property damage" and because they fall within Exclusion (f) of the policy.

[I]nsurance policies are construed strictly against the insurer and liberally in favor of the insured so as not to defeat the intended purpose of the policy. But this does not mean that courts in giving a liberal construction to a policy can

ascribe to it a meaning not coming within the limits of the language of the contract of insurance. Nor can courts read into it conditions and terms not incorporated therein.

*Cal. Union Ins. Co. v. Spade,* 642 S.W.2d 582, 583–84 (Ky.1982) (internal citations and quotations omitted).

As a last resort to justify finding coverage, the majority opinion relies on that old standby, the "doctrine of reasonable expectations," (though it cites a case in which resort to the doctrine was rejected). *Ante,* at 837. "The doctrine of reasonable expectations is used in conjunction with the principle that ambiguities should be resolved against the drafter in order to circumvent the technical, legalistic and complex contract terms which limit benefits to the insured." *Simon v. Cont'l Ins. Co.,* 724 S.W.2d 210, 212–13 (Ky.1986) (quoting R.H. Long, *The Law of Liability Insurance* § 5.10(B)). However:

> [C]ourts should resort to the doctrine of reasonable expectations only when the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage. When the terms of an insurance contract are clear, [as in this case,] it is the function of a court to enforce it as written and not to make a better contract for either of the parties.

*Signo Trading,* 612 A.2d at 938. Appellees are not unsophisticated, uneducated, "run-of-the-mill" policyholders. They are specialists in the field of nuclear waste disposal who purchased policies of public liability insurance specially tailored to the nuclear energy industry for the purpose of providing coverage for potential third-party liability damages as required by 42 U.S.C. § 2210(a). Their efforts to convert them into first-party policies are both unconvincing and disingenuous.

## V. FORTUITY—JURY INSTRUCTIONS.

The majority opinion reverses and remands for a new trial the issue of fortuity because of an allegedly improper jury instruction. In doing so, it has seriously misconstrued the holding in *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Insurance Co.,* 814 S.W.2d 273 (Ky.1991). ANC raised the fortuity defense only against the claims of the Commonwealth (NREPC) and U.S. Ecology.

"Implicit in the concept of insurance is that the loss occur as a result of a fortuitous event, not one *planned, intended, or anticipated.*" Lee R. Russ & Thomas F. Segalla, 7 *Couch on Insurance 3d* § 101:2, at 101–8 (1997) (emphasis added). "The fortuity principle is central to the notion of what constitutes insurance. The insurer will not and should not be asked to provide coverage for a loss that is *reasonably certain or expected to occur* within the policy period." Eric Mills Holmes & Mark S. Rhodes, 1 *Appleman on Insurance 2d* § 1.4, at 26 (1996) (emphasis added). Because the fortuity principle never appears in insurance contracts, it is sometimes referred to as the "unnamed exclusion." Stephen A. Cozen & Richard C. Bennett, *Fortuity: The Unnamed Exclusion,* 20 Forum 222, 222 (1985). The principle is rooted in common law and in the statutes of some states. M. Elizabeth Medaglia, et al., *The Status of Certain Nonfortuity Defenses in Casualty Insurance Coverage,* 30 Tort & Ins. L.J. 943, 945 (1995).

Contrary to the assertion in the majority opinion, *Brown Foundation* did not hold that the fortuity principle entitled the insured to coverage "unless it had *specific and subjective intent to cause the pollution* giving rise to the CERCLA claims." *Ante,* at 836 (emphasis added). What *Brown Foundation* held was that "if *inju-*

ry was not *actually and subjectively intended or expected* by the insured, coverage is provided even though the action giving rise to the injury itself was intentional and the injury foreseeable." 814 S.W.2d at 278 (emphasis added). At trial, the issue was submitted to the jury by an interrogatory that asked the jury if it believed that "the Commonwealth's share of the site costs now required by the EPA were expected, intended, anticipated or foreseen by the Commonwealth when the insurance policy was issued."

I agree that the interrogatory varied slightly from *Brown Foundation*'s holding by including the word "anticipated" (though such conformed to the definition recited in *Couch, supra,* and "anticipated" is indistinguishable from "expected to occur," which is recited in *Appleman, supra*). Requiring a specific and subjective intent to "cause the pollution" is a far greater standard than *Brown Foundation*'s "intended or expected the injury" requirement and would equate the fortuity defense with the "intentional act" exclusion found in most liability insurance policies. The fortuity defense was properly adopted and defined in *Brown Foundation* and we should either follow *Brown Foundation* or overrule it.

I would further note that since the majority holds that clean-up costs are not covered by the ANI policies, the fortuity issue pertains only to the site improvement measures. Those measures were not ordered because the Commonwealth "cause[d] the pollution," *ante,* at 836, but to repair and improve the site's containment features so as to alleviate the threat that pollution might migrate to the property of others in the future. Whether the Commonwealth intentionally caused pollution would only be relevant to whether it was liable for clean-up costs. If the Facility Form did cover the site improvement measures (which it does not), a proper interrogatory with respect to the fortuity defense under *Brown Foundation* would be, *e.g.*: "Did the Commonwealth intend or expect, when the Facility Form policy was issued, that future repairs and improvements to the facility, such as those subsequently recommended by the EPA, would be necessary?"

## VI. DEFENSE COSTS.

### A. Duty to defend.

The coverage clause of the ANI policies provides as follows with respect to the duty to defend:

> [T]he companies *shall defend any suit* against the insured alleging such bodily injury or property damage and *seeking damages which are payable under the terms of this policy;* but the companies *may* make such investigation, negotiation and settlement of any *claim or suit* as they deem expedient.

(Emphasis added.) We recently explained the scope of an insurer's "duty to defend" as follows:

> In Kentucky, an insurer has a duty to defend if there is an allegation which might come within the coverage terms of the insurance policy, but this duty ends once the insurer establishes that the liability is in fact not covered by the policy.[33] As previously discussed, coverage under the Agreement did not extend to the Magistrates' actions. We believe this is readily evident from a comparison of the complaint in the underlying action and the Agreement. The claims were clearly and expressly excluded and thus KALF appropriately declined to defend the allegations.

---

[33] *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.,* 814 S.W.2d 273, 279 (Ky.1991); *see also Thompson v. West Am. Ins. Co.,* 839 S.W.2d 579, 581 (Ky.

App.1992) (citing *Cincinnati Ins. Co. v. Vance,* 730 S.W.2d 521 (Ky.1987)) ("The allegations of the complaint cannot compel a defense if coverage does not exist. The obligation to defend arises out of the insurance contract, not from the allegations of the complaint against the insured."); *Ky. Farm Bureau Ins. Co. v. Cann,* 590 S.W.2d 881, 883 (Ky.App.1979) (explaining that there is no duty to defend claims expressly excluded).

*Ky. Ass'n of Counties All Lines Fund Trust v. McClendon,* 157 S.W.3d 626, 635 (Ky.2005). "The determination of whether a defense is required must be made at the outset of the litigation." *Brown Found.,* 814 S.W.2d at 279.

In the first place, there was no duty to defend the Commonwealth in the CERCLA administrative proceedings because the NREPC was in the posture of plaintiff, not defendant. Since it caused the proceedings to be initiated for the purpose of spreading its own preexisting liability to others, it should not now be permitted to claim that it was entitled to a "defense" to those proceedings. Regardless, ANI owed no duty to defend any of the appellees in this case because (1) the CERCLA proceedings were not a "suit;" and (2) the PRP letters did not "seek[ ] damages which are payable under the terms of this policy."

### 1. "Suit."

There is nothing ambiguous or all-inclusive about the word "suit." It has always referred to an action brought in a court of justice seeking a legal remedy.

> The term is certainly a very comprehensive one, and is understood to apply to any proceeding in a court of justice, by which an individual pursues that remedy in a court of justice, which the law affords him. The modes of proceeding may be various, but if a right is litigated between parties in a court of justice, the proceeding by which the decision of the court is sought, is a suit.

*Weston v. City Council of Charleston,* 27 U.S. (2 Pet.) 449, 464, 7 L.Ed. 481 (1829) (op. by Marshall, C.J., construing section 25 of the Judiciary Act of 1789).

To characterize an administrative agency proceeding as a "suit" is akin to saying that a bulldozer is a "building." *See Commonwealth v. Plowman,* 86 S.W.3d 47, 50–54 (Ky.2002) (Keller, J., dissenting). "Ambiguity (as opposed to outright lack of understanding) is created only by converting an insured's hope or assumption that every out-of-pocket payment is covered into a part of the contract language." *Patrons Oxford,* 573 A.2d at 19.

> Under [CERCLA], the federal government may seek an injunction requiring the responsible party to clean up an environmentally contaminated site. See 42 U.S.C. section 9606(a) (2000). In the alternative, the government may: (1) clean up the site and demand reimbursement for its incurred costs (42 U.S.C. sections 9604(a)(1), 9607(a) (2000)); or (2) issue an administrative order requiring the responsible party to perform the cleanup, subject to civil fines for a failure to comply. 42 U.S.C. section 9606(a), (b) (2000).

*Central Illinois Light Co. v. Home Ins. Co.,* 342 Ill.App.3d 940, 277 Ill.Dec. 45, 795 N.E.2d 412, 425 (2003) (note the absence of any reference to "site measures"). In the alternative, the government can bring a suit in federal court.

> In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or

threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. 42 U.S.C. § 9606(a). Thus, CERCLA authorizes both "suits" and administrative proceedings. Under ANI's policies, the duty to defend is triggered only by a "suit."

> [T]he policies do not treat the terms "suit" and "claim" as interchangeable, but consistently treat them separately. This careful separation indicates that the insurers' differing rights and obligations with respect to "suit[s]" and "claim[s]" were deliberately and intentionally articulated in the policies. The effect of such policy language is that an insurer owes a duty to defend "suits" but no duty to defend "claims" which have not yet become "suits." Instead, the insurer has the discretionary right to investigate and settle "as it deems expedient."

*Foster–Gardner, Inc. v. Nat'l Union Fire Ins. Co.,* 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265, 280–281 (1998) (holding that order issued by state EPA, pursuant to state "Superfund" law, directing insured to remediate pollution allegedly caused by its fertilizer and pesticide business, did not constitute "suit" within meaning of comprehensive general liability (CGL) insurance policies, so as to give rise to insurer's duty to defend).

> Thus, the duty to defend extends only to suits and not to allegations, accusations or claims which have not been embodied within the context of a complaint. In the instant case, a complaint alleging

liability for property damage has never been filed against Lapham–Hickey. Without a complaint, there is no "suit." And without a "suit," Protection's duty to defend Lapham–Hickey is not triggered.

> That the word "suit" refers to a proceeding in a court of law is also apparent by looking at the Protection policy itself. If all of the policy's language is to be given effect, then the words "suit" and "claim" as used within provision 5 must have different meanings. While Protection has the power to investigate any claim, it has the duty to defend only suits. If the word "suit" was broadened to include claims, in the face of policy language which distinguishes between the two, any distinction between these two words would become superfluous. The distinction the policy draws between suits and claims must be respected.

> Neither the initial letter from the EPA, the draft consent order nor the "no-action" letter initiated a suit. None was filed in a court of law and none accomplished service of process upon Lapham–Hickey. Rather, the draft consent order and ultimately the "no-action" letter were mechanisms used to encourage Lapham–Hickey to voluntarily investigate the contamination at the facility. Though the tone of these documents may have been confrontational, these documents by themselves are not complaints and do not impose liability.

*Lapham–Hickey Steel Corp. v. Prot. Mut. Ins. Co.,* 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842, 847–48 (1995) (internal citations omitted).

*See also Aetna Cas. and Sur. Co. v. Gen. Dynamics Corp.,* 968 F.2d 707, 713–14 (8th Cir.1992) (holding that letters sent by EPA to insured requiring insured to clean up hazardous waste were not "suits" that triggered CGL insurer's duty to defend under

Missouri law; demand letters did not seek damages, but, rather, sought to have insured participate in, and negotiate, clean up of various sites), *reaffirmed by Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 765 (8th Cir.2003); *Joslyn Mfg. Co. v. Liberty Mut. Ins. Co.*, 836 F.Supp. 1273, 1279 (W.D.La.1993) ("[T]he August 2 and the amended December 17 compliance orders issued by the DEQ [state environmental agency] do not rise to the level of a suit which would invoke Liberty Mutual's duty to defend. The court bases this conclusion on several factors: (1) the compliance order itself specifically provides that if respondent refuses to comply with the order, the respondent could be subject to possible enforcement procedures ..., i.e., a civil action or civil penalties; (2) the general and traditional definition of a suit refers to a formal proceeding in a court of law; and most importantly, (3) the insurance policies specifically differentiate between the words claim and suit for purposes of the duty to defend. An insurance policy is a contract, and this court finds that Liberty Mutual only contracted to defend Joslyn against suits, not against compliance orders of this nature."); *Metro Wastewater Reclamation Dist. v. Cont'l Cas. Co.*, 834 F.Supp. 1254, 1258 (D.Colo. 1993) (" '[S]uit' does not encompass the EPA proceeding alleged here. Thus, ... the defendants had no obligation to defend the plaintiffs under either the property damage liability coverage provisions or the personal injury liability coverage provisions."); *Harleysville Mut. Ins. Co., Inc. v. Sussex County, Del.*, 831 F.Supp. 1111, 1132 (D.Del.1993) ("[T]he PRP letters sent to the County by the EPA do not constitute a 'suit' and, therefore, the insurers do not have a duty to defend the County against the CERCLA proceeding brought by the EPA to investigate and control the release or threatened release of hazardous substances, pollutants, or contaminants at Landfill No. 5 .... The EPA letter at issue merely informed [the insured] of its potential liability under CERCLA and that the EPA was interested in discussing [the insured's] voluntary participation in remedial measures. The letter was an invitation to voluntary action on [the insured's] part and is not the equivalent of the commencement of a formal proceeding within the meaning of the subject comprehensive general liability policies."); *Cedar Lane*, 883 P.2d at 603 ("[I]nasmuch as we have determined that the damages here were within the policy exclusions, St. Paul had no duty to defend."); *Patrons Oxford* 573 A.2d at 20 (holding that state DEP's administrative proceeding to compel clean-up of pollution was not "suit against the insured seeking damages" within meaning of multiperil policy requiring insurer to defend insured in any suit seeking damages); *Technicon Elecs. Corp. v. Am. Home Assur. Co.*, 141 A.D.2d 124, 533 N.Y.S.2d 91, 104–05 (1988) ("[T]he 'potentially responsible person' letter sent by the EPA to Technicon on March 1, 1985, does not constitute the institution of a 'suit' ... as that term is used in the subject policies so as to require a defense.... The EPA letter at issue merely informed Technicon of its potential liability under CERCLA and that the EPA was interested in discussing Technicon's voluntary participation in remedial measures. The letter was an invitation to voluntary action on Technicon's part and is not the equivalent of the commencement of a formal proceeding within the meaning of the subject comprehensive general liability policies.").

The facts of this case exemplify why nuclear facility and waste-hauler insurers do not provide coverage or defense costs for CERCLA proceedings. The EPA sent 832 PRP letters to "potentially responsible parties" in this case. Ultimately, over 200 of these PRPs were found to have no

responsibility at all and only 82 had sufficient responsibility to participate in the steering committee. Yet, based on today's majority opinion and the definition of "insured" in the ANI policies, ANI had a duty to defend each of the 832 PRPs, including not only the NREPC but also the United States Departments of Defense and Energy. Because of obvious conflicts of interest (each PRP would be attempting to reduce its own liability and thereby increase the liability of the others), ANI would be required to provide separate counsel for each insured. *See Acushnet Co. v. Coaters, Inc.,* 972 F.Supp. 41, 70 (D.Mass.1997) (in civil action by PRPs who had entered into consent decree with EPA and sued by common representation other PRPs for contribution, *held:* "In view of their choice for common representation, ... the attorneys they have chosen are disabled from arguing to the court for any judicial allocation of shares among settling parties themselves; the attorneys would inevitably be preferring one client's interest over another client's interest in attempting to do so."). The potential for such conflicts of interest among PRPs was recognized during the Congressional debate over the 1986 SARA amendments to CERCLA. *See Ohio v. United States Dep't of Interior,* 880 F.2d 432, 466 (D.C.Cir.1989). If required to provide a separate defense for each of 832 "insureds" who received PRP letters from the EPA, the cost of defense of the CERCLA proceedings would no doubt exceed the costs incurred to clean up and improve the containment features of the site, itself. (Appellees claim that their defense costs and expenses presently exceed $7,000,000.)

2. *"Seeking damages which are payable under the terms of this policy."*

As discussed earlier, the ANI polices were third-party liability policies not designed to reimburse the insureds for clean-up and capital improvements to the insured property. Although the PRP letters alleged increased levels of radionuclides on adjacent properties, they did not allege any damage to adjacent properties from that fact—and the EPA eliminated that finding from its Administrative Order by Consent issued four months later. Therefore, the CERCLA proceedings did not seek any damages payable under the terms of ANI's policies. "The qualifying phrase, 'to which this insurance applies' underscores the basic notion that the premium paid by the insured does not buy coverage for all property damage but only for that type of damage provided for in the policy." *Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 790 (1979) (CGL insurer had no duty to defend suit against insured mason which only claimed faulty masonry work, not bodily injury or property damage). *See also Lenning v. Commercial Union Ins. Co.,* 260 F.3d 574, 581 (6th Cir.2001) (denying claim for cost of defense because "Tapp's complaint did not allege the type of claims that would be covered by the policy. In addition, the language of the complaint reveals that any potential coverage was abrogated by two explicit coverage exclusions.") (construing Kentucky law). Since the CERCLA proceedings did not seek any damages covered by ANI's policies, ANI had no duty to provide a defense to those proceedings. To hold otherwise would be akin to holding that an automobile insurer had a duty to defend a suit brought against its insured alleging that the plaintiff sustained damages as a result of being bitten by the insured's dog.

*B. Costs in excess of policy limits.*

As noted earlier, the limit of liability of the ANI policies is measured by both damages and costs of defense cumulatively incurred by any or all potential insureds. The majority opinion holds that because

ANI breached its contractual obligation to defend Appellees in the CERCLA proceedings, it must pay the full amount of defense costs and fees even if payment of those sums, in addition to the so-called "CERCLA damages," would exceed the policy limits, citing *Eskridge v. Educator and Executive Insurers, Inc.*, 677 S.W.2d 887 (Ky.1984), and *Grimes v. Nationwide Mutual Insurance Co.*, 705 S.W.2d 926 (Ky.App.1985). The issue in those cases, however, was whether a liability insurance company that wrongly denied coverage and declined to defend a suit against the insured is liable for a *judgment* against the insured in excess of the policy limits. The theory behind that principle is that the judgment might not have exceeded the policy limits if the insurer had provided a defense. *Eskridge*, 677 S.W.2d at 890; *Grimes*, 705 S.W.2d at 932. That is not the issue here. The only damages sustained by Appellees as a result of ANI's refusal to provide a defense are the defense costs themselves, not an excess judgment that might have been avoided if a defense had been provided.

As held by the Court of Appeals, the measure of damages for a breach of contract is "that sum which will put the injured party into the same position he would have been in had the contract been performed." *Perkins Motors, Inc. v. Autotruck Fed. Credit Union*, 607 S.W.2d 429, 429–30 (Ky.App.1980). *See also State Prop. and Bldgs Comm'n of Dep't of Fin. v. H.W. Miller Constr. Co.*, 385 S.W.2d 211, 214 (Ky.1964) ("[D]amages should not exceed the sum that is reasonably required in order to put the owner in the same position in which he would have been had the contract been performed."); *Robinson v. W. Union Tel. Co.*, 68 S.W. 656, 658 (Ky.1902) ("[T]he declared object of awarding damages is to give compensation for pecuniary loss; that is, to put the plaintiff in the same position, so far as

money can do it, as he would have been if the contract had been performed ....") (internal citation and quotation omitted). The purpose of damage awards in breach-of-contract cases is to compensate the injured party for loss occasioned by the conduct of the breaching party, not to penalize the wrongdoer or to award the plaintiff a windfall. *Farmers & Bankers Life Ins. Co. v. St. Regis Paper Co.*, 456 F.2d 347, 351 (5th Cir.1972); *see also Safeco Ins. Co. of Am. v. City of White House*, 191 F.3d 675, 693 (6th Cir.1999). The same principle applies when an insurer breaches its contractual obligation to defend the insured against a suit falling within the coverage of the policy.

> [W]hen an insurer wrongfully refuses to defend on the ground that the claim against its insured is not within the coverage of the policy, the insurer is guilty of a breach of contract which renders it liable to the insured for all the damages that naturally flow from the breach. Such a breach of contract renders the insurer liable to pay such damages as will place the insured in a position equally as good as the insured would have occupied had the insurance contract been fully and properly performed from the beginning, including, in a proper case, the amount of the judgment against the insured.

44 Am.Jur.2d *Insurance* § 1406 (footnotes omitted). *See also, e.g., Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 559 (5th Cir.2004) (holding in action for breach of insurer's duty to defend suit brought for pollution damage that "[a] breach of the duty to defend entitles the insured to the expenses it incurred in defending the suit, including reasonable attorney's fees and court costs.").

Had ANI provided Appellees a "defense" in the CERCLA proceedings, they would not have incurred the expense of

retaining their own counsel or other costs and fees required for the defense, subject to the "limit of liability" condition of their policies. Requiring ANI to reimburse those costs dollar-for-dollar, plus interest, up to the limit of liability would place Appellees in the same position they would have been in had the breach not occurred. By holding that the breach of the duty to defend defaults the policy's limit of liability condition, the majority has either arbitrarily rewritten the parties' contracts, thus impairing the obligations of contract, or arbitrarily imposed, *sua sponte*, punitive damages in violation of KRS 411.184(4) ("In no case shall punitive damages be awarded for breach of contract."). Section 2 of our Constitution prohibits the exercise of arbitrary power by any public body, including this Court. *Ky. Milk Mktg. and Antimonopoly Comm'n v. Kroger Co.*, 691 S.W.2d 893, 899 (Ky.1985) ("No board or officer vested with governmental authority may exercise it arbitrarily."). Section 2 applies not only to fundamental human rights, but to economic and business rights as well. *Cf. Stephens v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 624, 627 (Ky.1995).

Accordingly, I dissent.

ROACH, J., joins this opinion except for its reliance on Section 2 of the Constitution of Kentucky.