**Richard G. LaVALLEY, Plaintiff,**

v.

**VIRGINIA SURETY COMPANY, INC., et al., Defendants.**

**No. 3:98CV7257.**

United States District Court, N.D. Ohio, Western Division.

March 7, 2000.

---

Janine T. Avila, Reginald S. Jackson, Jr., Steven R. Smith, Connelly, Soutar & Jackson, Toledo, OH, for Plaintiff.

George D. Jonson, Montgomery, Rennie & Jonson, Cincinnati, OH, Clifford C. Masch, Michelle J. Sheehan, Reminger & Reminger, Cleveland, OH, for Defendants.

## ORDER

CARR, District Judge.

This is an insurance coverage dispute in which plaintiff Richard LaValley, an attorney, seeks a declaratory judgment that he may recover the defense and settlement costs of a lawsuit brought against him under his malpractice insurance policy. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Pending are LaValley's and defendant Virginia Surety's motions for summary judgment. For the following reasons, Virginia Surety's motion is granted and LaValley's motion is denied.

## BACKGROUND

### I. Insurance Policy

LaValley is an attorney doing business in Sylvania, Ohio, and is a partner in the law firm LaValley, LaValley & Todak. LaValley and his firm purchased a "claims made" insurance policy from Virginia Surety, entitled "Lawyers Professional Li-ability Insurance." The policy period was from March 14, 1995 to March 14, 1996, and it insured LaValley's firm, its attorneys, shareholders and employees against liability for negligent performance of professional services.

Specifically, the policy required Virginia Surety:

I. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any act, error or omission of the insured in the rendering of or failure to render professional service for others, provided always that:

a. Claim is first made against the insured and reported to the company during the policy period or the extended reporting period, if purchased, by reason of such act, error or omission; and

b. The insured, on the effective date of the policy, did not know or could not reasonably foresee that such act, error or omission might be the basis for a claim.

Further, the policy obligated Virginia Surety to "defend any claim to which this insurance applies, even if any allegation of the claim are groundless, false or fraudulent." Virginia Surety's coverage obligation and duty to defend was limited by a $2 million cap on liability, subject to a $10,000 deductible for each claim. The policy also contained several coverage exclusions, including an exclusion known as the "prior notice" exclusion, found at exclusion (f).

### II. Fox Companies

In the 1980s, LaValley incorporated a company in Ohio called Fox Research. Fox Research had nine shareholders, each of whom owned 50 shares in the company. The shares were priced at $500 per share, so the total value of each shareholder's investment was $25,000. Once everyone had made their investments, Fox Research's assets came to $2.25 million. In

addition to LaValley, two Fox Research shareholders are worth mentioning by name: Delos Palmer and Harold McMaster.

The purpose of creating Fox Research was to fund a company called Fox Software, which later became known as Fox Software II. Fox Software used seed money provided by Fox Research to develop application programs to run on IBM computers; the most successful of these programs was called FoxBASE. LaValley owned seventy percent of Fox Software until 1985, and fifty percent thereafter. David Fulton, a software developer, owned thirty percent of Fox Software until 1985, fifteen percent until 1988, and fifty percent thereafter.

Fox Software, in turn, was part of a holding company known as Fox Holdings. LaValley and Fulton were equal co-owners of Fox Holdings, with each possessing a fifty percent share.

In early 1992, Microsoft announced that it planned to purchase Fox Holdings for 1,360,000 shares of Microsoft stock, then having a market value of about $180 million. Shortly thereafter, LaValley began negotiating with Fox Research's shareholders, seeking to buy their shares and to get them to relinquish their rights, if any, to applications developed by Fox Software. Eventually, all shareholders agreed to give up their respective shares in Fox Research for $100,000. One shareholder, however, refused to sign a settlement and release agreement (release) that effectively would extinguish any future rights he might claim in FoxBASE. That shareholder was Delos Palmer. The remaining shareholders, including Harold McMaster, did, however, ultimately sign the release, and received $400,000 on top of the $100,000 already paid to each of them. Then, upon a vote of the shareholders, Fox Research was dissolved. Soon thereafter, the Microsoft sale took place.

## III. Shareholder Lawsuits

On June 23, 1992, Palmer sued LaValley in the Northern District of Ohio, alleging that LaValley breached fiduciary and other responsibilities an attorney owes to his clients through his relationship with Fox Research. Specifically, Palmer alleged that while LaValley acted as an attorney to Fox Research he misappropriated corporate opportunities to Fox Software and Fox Holdings, companies in which he owned a substantially larger interest than he did in Fox Research. Judge Zatkoff was assigned the case.

Less than one year after the *Palmer* suit was filed, LaValley notified his then malpractice insurance carrier, Vasa North Atlantic Insurance Company (VASA), that a claim of professional negligence was pending against him and his firm. As part of this notice, LaValley provided VASA with a copy of the *Palmer* complaint.

In 1994, *Palmer* went to trial; a jury returned a verdict in favor of Palmer and against LaValley for $22 million. That verdict later was overturned by the Sixth Circuit on appeal.

After the verdict, another suit was brought against LaValley in the Northern District of Ohio, this one by the McMaster Foundation. The McMaster Foundation was the successor in interest to the claims of Harold McMaster. *McMaster*—filed during the Virginia Surety policy period—likewise accused LaValley of professional malpractice stemming from his involvement with Fox Research. Thus, LaValley notified Virginia Surety of the claims pending against him, and provided Virginia Surety with a copy of the *McMaster* complaint.

LaValley later settled *McMaster* for $500,000. He then requested that Virginia Surety reimburse him for the cost of settlement plus the $298,037.67 he spent to defend the litigation. Virginia Surety refused do so, citing, among other things, the prior notice exclusion in its policy. The prior notice exclusion bars coverage for

"any claim arising from any circumstance of which notice has been given under any policy in effect prior to or at the inception of the policy period." This declaratory judgment action followed.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Services,*

*Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## DISCUSSION

LaValley argues that exclusion (f)—the prior notice exclusion—does not bar coverage in this case because it is ambiguous, and, thus, should be construed against Virginia Surety. In the alternative, LaValley argues that even if exclusion (f) were found to be unambiguous, it cannot take away coverage because the facts, parties and circumstances of *Palmer* differ substantially from *McMaster*, so much so that the claim for coverage here does not arise from "any circumstance of which notice has been given under any policy in effect prior to or at the inception of the policy." Virginia Surety counters that exclusion (f) is entirely clear, and that *Palmer* and *McMaster* are enough alike that plaintiff's notice of *Palmer* to its previous insurer, VASA, triggers the prior notice exclusion. I agree with Virginia Surety.

■ An insurance policy is a written contract, and, therefore, its terms determine the intention of the parties concerning coverage. *Minor v. Allstate Ins. Co., Inc.*, 111 Ohio App.3d 16, 19, 675 N.E.2d 550 (1996). In construing contracts of insurance, words must be given their plain and ordinary meaning, and only in situations where the contract is ambiguous (and thus susceptible to more than one interpretation) must the policy language be liberally construed in favor of coverage. *Dairyland Ins. Co. v. Finch*, 32 Ohio St.3d 360, 362, 513 N.E.2d 1324, (1987); *Faruque v. Provident Life & Acc. Ins. Co.*, 31 Ohio St.3d 34, 38, 508 N.E.2d 949 (1987). Courts should not, however, construe an insurance contract in the absence of ambi-

guity in its language. *Karabin v. State Auto. Mut. Ins. Co.,* 10 Ohio St.3d 163, 166–167, 462 N.E.2d 403 (1984). *See also King v. Nationwide Ins. Co.,* 35 Ohio St.3d 208, 211, 519 N.E.2d 1380 (1988) (holding that only if provisions in an insurance contract are open to more than one interpretation should it "be construed strictly against the insurer and liberally in favor of the insured."). If the insurance contract is "clear and unambiguous," its interpretation is a question of law. *Beaver Excavating Co. v. United States Fid. & Guar. Co.,* 126 Ohio App.3d 9, 14, 709 N.E.2d 858 (1998).

In order to preclude coverage by operation of a policy exclusion, the exclusion "must be stated clearly in explicit wording setting forth with specificity exactly what is to be excluded." *River Servs. Co. v. Hartford Accident & Indem. Co.,* 449 F.Supp. 622, 626 (N.D.Ohio 1977) (citing *American Financial Corp. v. Fireman's Fund Ins. Co.,* 15 Ohio St.2d 171, 173–74, 239 N.E.2d 33 (1968)). "The insurer, being the one who selects the language in the contract, must be specific in its use; an exclusion from liability must be clear and exact in order to be given effect." *Lane v. Grange Mut. Cos.,* 45 Ohio St.3d 63, 65, 543 N.E.2d 488 (1989). Further, the insurer, not the insured, bears the burden of proving the applicability of an exclusion in its policy. *Continental Ins. Co. v. Louis Marx Co.,* 64 Ohio St.2d 399, 401, 415 N.E.2d 315 (1980).

Here, exclusion (f) is clear, unambiguous, and specific in what it excludes. The exclusion bars "[a]ny claim arising from any circumstance of which notice has been given under any policy in effect prior to or at the inception of the policy." Thus, giving these words their plain meaning, exclusion (f) is activated when 1) a claim against the insured arises out of circumstances that predate the execution of the insured's current policy, and 2) those circumstances somehow were brought to the attention of a former insurer in accordance with an earlier policy. Nothing about the prior notice exclusion is confusing or difficult to understand.

In fact, it is not surprising to see exclusion (f) in the policy at issue here, which is a "claims made" policy. "Claims made" policies, unlike occurrence policies, are designed to limit liability to a fixed period of time." *United States v. A.C. Strip, et al.,* 868 F.2d 181, 187 (6th Cir.1989). Only claims made against the insured during the policy period, therefore, will be considered within the scope of coverage, even if the acts giving rise to liability occurred before the policy went into effect. *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 538 n. 3, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) (observing that in contrast to an occurrence policy, which protects the insured from liability for acts committed during the policy period, a claims made policy protects the holder only from claims made during the policy period).

The problem with claims made policies, from an insurer's perspective, is that insureds might try to obtain coverage for claims they know or are reasonably certain will be made against them in the near future. This moral hazard threatens to undermine one of the basic principles of insurance, which is that known liabilities generally are not insurable. Russ and Segalla, Couch on Insurance § 102:7, at p. 102–17 (3rd ed. 1997) ("Implicit in the concept of insurance is that the loss occur as a result of an event that is fortuitous, rather than … anticipated."). Virginia Surety's policy contains a provision designed to prevent this from happening (Virginia Surety Policy at ¶ I.b), but, as one can imagine, it can be difficult to determine whether an insured knew of its impending liability before purchasing insurance, leading to triable issues of fact that insurers would rather avoid.

Exclusion (f) appears to have been conceived to eliminate some of this uncertainty by establishing a presumption of no coverage where the insured has notified a previous insurer of the circumstances sur-

rounding an insurable claim, and then later notifies its current insurer of a subsequent claim that is born of any of the same circumstances. Whether the insured knew that multiple claims would be brought against it is irrelevant; under exclusion (f), so long as there are "any circumstance[s] of which notice has been given" under previous policies, claims stemming from those circumstances will be excluded.

Though no court in Ohio has examined the prior notice exclusion, at least one federal court has, and determined that it is enforceable. In *Zunenshine, et al. v. Executive Risk Indem., Inc.,* 1998 WL 483475 (S.D.N.Y. Aug.17, 1998) (unpublished opinion), the district court held that a prior notice exclusion, substantially similar to the one at issue here, was unambiguous and binding upon policy holders. Plaintiff Zunenshine and his colleagues (collectively plaintiffs) were executives in a company, SLM, that manufactured sporting goods, toys, and fitness products for sale in the United States and Canada. These executives purchased directors and officers insurance from defendant Executive Risk Indemnity (Executive Risk); their policy contained a provision that excluded from coverage any losses arising out of "any fact, circumstance, situation, [or] transaction ..., which before May 24, 1996, was the subject of any notice given under any policy of directors and officers liability or other similar insurance." The policy period for this insurance was May 24, 1996 through May 24, 1997 (the D & O policy).

Over one year before plaintiffs purchased their D & O policy, they issued $71 million in unsecured SLM notes to a group of investors (noteholders). Later, during the D & O policy period, the noteholders sued plaintiffs for negligently misrepresenting SLM's financial condition, presumably because the notes had lost all or part of their value, though the record in this regard is indeterminate. Particularly, the noteholders alleged that plaintiffs provided false information about SLM's 1993 income, income growth, and spending on advertising, which induced the sale of the notes. The suit was settled by plaintiffs for $12.5 million, and it was this amount that they sought to recover under their D & O policy from Executive Risk.

Executive Risk, however, denied the claim, asserting the prior notice exclusion. According to Executive Risk, plaintiffs had been sued in 1994 by a class of former stockholders, who, like the noteholders, based their case (at least in part) on the dissemination of false and misleading financial information in 1993. In response to that suit, plaintiffs notified Chubb Insurance Company, their previous directors and officers liability insurer, providing Chubb with a copy of the stockholders' complaint. The stockholders' suit was settled in 1996 for $2.9 million. Because Executive Risk perceived the noteholders' suit to derive from the same circumstances as the stockholders' suit, they would not cover plaintiffs' losses as a result of settling the noteholders' suit.

Plaintiffs then brought a declaratory judgment action against Executive Risk. On summary judgment, plaintiffs argued to the district court that the prior notice exclusion was ambiguous because it was subject to more than one reasonable interpretation. The district court rejected this argument, noting that "nothing in the plain language of" the exclusion is ambiguous. *Zunenshine,* 1998 WL 483475 at *4. The district court further remarked that to afford coverage in abrogation of the prior notice exclusion would give plaintiffs more than they paid for:

Finally, this reading of the ... 'prior notice' exclusion[ ] is consistent with the purpose behind 'claims made' insurance, i.e., 'to limit [the insurer's] liability to a fixed period of time.' This increased certainty permits an insurer to charge lower premiums for this particular species of policy. To permit an insured to recover for claims arising from the same 'fact[s], circumstance[s], situation[s], transactions[s], [or] event[s]' alleged in a pending lawsuit or made the subject of a

prior notice given to another insurer 'would be to grant the insured more coverage than he bargained and paid for, and to require the insurer to provide coverage for risks not assumed.' *Id.* at *5 (quoting *A.C. Strip, et al.*, 868 F.2d at 187) (internal citations omitted).

On appeal, the Second Circuit upheld the reasoning of the district court: "We agree with the district court that the language of the [D & O] policy is unambiguous, and that it clearly applies to exclude coverage for losses incurred in connection with the [n]oteholders' lawsuit." *Zunenshine, et al. v. Executive Risk Indem., Inc.*, 1999 WL 464988 (2nd Cir. June 29, 1999) (unpublished opinion).

█ Because I too agree with the district court in *Zunenshine*, I find that the prior notice exclusion at issue here is enforceable. The only remaining question is whether the *Palmer* and *McMaster* litigations can be said to arise from any of the same circumstances. If they do, exclusion (f) blocks coverage for LaValley's defense and settlement costs in *McMaster*. If they do not, exclusion (f) has no effect.

In *Palmer*, Delos Palmer alleged four causes of action on behalf of himself and Fox Research against LaValley: 1) misappropriation of corporate opportunities, 2) unjust enrichment and constructive trust, 3) breach of fiduciary duty and other obligations of an attorney to his client, and 4) payment of dividends. As to Count III, the *Palmer* complaint alleged that LaValley acted as an attorney to the individual shareholders in Fox Research, and that he "took advantage of the trust the shareholder clients placed in him, by acting not in the interests of Fox Research ... but rather acting primarily in his own interests...." (*Palmer* Complaint at ¶ 56). On the basis of this allegation and others, LaValley notified, by letter, his professional liability insurance carrier, VASA, of the *Palmer* lawsuit, enclosing for VASA's records a copy of the *Palmer* complaint. (Defendant's Exhibit H at 00127–128). LaValley also informed VASA that his lawyers

had moved for summary judgment on Count III, and that he did not "believe there would be any merit to a claim of negligence or legal malpractice" against him personally or the members of his firm. (*Id.*).

In ruling on the summary judgment motion to which LaValley referred in his letter to VASA, Judge Zatkoff held that Count III was, at bottom, a legal malpractice claim: "[I]t is the opinion of this Court that Count III[of] plaintiff's complaint is a claim based on legal malpractice." (*See* Zatkoff Order at L–009202). After this order was issued, LaValley's lawyers contacted VASA, observing that "[w]hile we do not agree with the court's opinion, it is necessary to put you on notice of the ... potential for a recovery on the basis of a failure to render professional services in the attorney/client relationship." (Defendant's Exhibit J at 97–98).

The *McMaster* complaint likewise alleged that LaValley committed malpractice in his dealings with the Fox Research shareholders. In paragraph 67, the complaint stated "[i]n ... LaValley's position as attorney and advisor to his clients and investors in Fox Research, he took advantage of the trust that McMaster and the other shareholder clients placed in him, by not acting in the interests of Fox Research ... but rather in his own...." This language tracks the language used in the *Palmer* complaint.

As already detailed, Fox Research was made up of nine shareholders—Palmer, McMaster, LaValley and six others—who provided working capital to Fox Software, so that Fox Software could develop application programs to run on IBM computers. Fox Software, which later became known as Fox Software II, was part of Fox Holdings. Fox Holdings had two shareholders: LaValley and David Fulton. Just before LaValley and his partner sold Fox Holdings to Microsoft, LaValley bought out the other shareholders in Fox Research for approximately $4 million, in exchange for

which the shareholders (with one exception) relinquished their ownership rights in Fox Research and signed a release.

 The common theme of both the *Palmer* and *McMaster* suits is that certain former shareholders in Fox Research believe they were cheated by LaValley out of their portion of the stock paid by Microsoft for Fox Holdings. These shareholders, whether rightfully or wrongfully, felt they helped build Fox Software, a significant asset of Fox Holdings, and that had LaValley not abused his relationship with them as their attorney, they would have shared in the Microsoft largess.

True, the *Palmer* and *McMaster* complaints are not the same. The parties are somewhat different, and the claims do not perfectly overlap. For example, *McMaster* sought recission damages while *Palmer* did not. Nevertheless, these two cases clearly arose from the same general circumstances, namely, LaValley's relationship with the shareholders in Fox Research.

Plaintiff's effort to point out facts that somewhat or partially distinguish *Palmer* from *McMaster* is a fruitless exercise. Exclusion (f) does not require that a subsequent claim be identical to a prior claim for the subsequent claim to be excluded. Again, the *Zunenshine* court's analysis on this issue is persuasive:

> Plaintiffs argue that the two lawsuits involved different parties, legal theories, ... and requests for relief.... However, these small differences are not material.... To read the additional terms suggested by plaintiffs into these exclusions would be at the same time to render them virtually meaningless: a claim would be excluded only if it were based on an identical lawsuit or were the subject of an identical prior notice given to another insurer. However, it is axiomatic that a court should not adopt an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless....'

*Zunenshine,* 1998 WL 483475 at *5 (internal citations omitted). Thus, if the subsequent claim merely arises from "any circumstance" of which notice previously has been given under an earlier policy, exclusion (f) eliminates coverage.

Here, there can be no dispute that VASA, LaValley's former insurer, was put on notice of the circumstances that later gave rise to the *McMaster* suit. LaValley contacted VASA, informed VASA of the malpractice claim made in the *Palmer* complaint, and provided a copy of the complaint to VASA. The malpractice claim in *McMaster* is akin to *Palmer* in that it accuses LaValley of putting his own financial well being ahead of the legal duties he owed to the shareholders of Fox Research, and of manipulating Fox Research to make millions for himself at the shareholders' expense. Thus, exclusion (f) prevents LaValley from recovering his defense and settlement costs in *McMaster* from Virginia Surety.

## CONCLUSION

It is, therefore, ORDERED THAT

Plaintiff LaValley's motion for summary judgment is denied and defendant Virginia Surety's motion for summary judgment is granted.

So ordered.