RENDERED: OCTOBER 20, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0260-DG

ASHLAND HOSPITAL CORPORATION                                    APPELLANTS
D/B/A KING'S DAUGHTERS MEDICAL
CENTER; JOHN VAN DEREN, III, M.D.;
RICHARD E. PAULUS, M.D.; SRIHARSHA
VELURY, M.D.; AND KENTUCKY HEART
INSTITUTE, INC.

ON REVIEW FROM COURT OF APPEALS
NOS. 2016-CA-0372 AND 2016-CA-0396
BOYD CIRCUIT COURT
NO. 15-CI-0070

V.

DARWIN SELECT INSURANCE CO. N/K/A                                APPELLEES
ALLIED WORLD SURPLUS LINES
INSURANCE CO.; HOMELAND INSURANCE
COMPANY OF NEW YORK

**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>REVERSING AND REMANDING</u>**

This case is before the Court on appeal from the Court of Appeals which

determined that Exclusion 15, the prior notice of events exclusion, contained in

the insurance policies applied to deny the coverage sought by the Appellants,

King's Daughters Medical Center (KDMC),[1] for claims made against it.

Consequently, the Court of Appeals also determined the insurance companies

were entitled to recoupment of expenses and remanded back to the trial court

---

[1] For ease of reference, we refer to all Appellants by KDMC.

for further proceedings. The Appellants moved for discretionary review which we granted. After reviewing the record and hearing oral arguments, we reverse the Court of Appeals on both issues. We remand back to the Court of Appeals to consider the applicability of two other exclusions in the policies which it had determined were superfluous to consider in light of its ruling as to Exclusion 15. The issue of recoupment was never properly before the Court of Appeals thus it lacked, and continues to lack, jurisdiction to rule on that matter even on remand.

## I.    Facts and Procedural Posture

There are three insurance policies between as many insurance companies involved in this case. The first is the Directors and Officers policy (D&O policy) issued by Darwin National Insurance Company (Darwin). The second is the professional liability policy issued by Darwin Select (Allied), a related entity to Darwin. Lastly is the excess liability policy issued by Homeland Insurance Company of New York (Homeland). Although the timeline of events spans three policy periods, KDMC sought professional liability and excess liability coverage from Allied and Homeland only for the policy period of 2012-2013.

In July 2011, KDMC was served a *subpoena duces tecum* by the United States Department of Justice pursuant to the Health Insurance Portability and Accountability Act of 1996. The subpoena sought a host of documents generally pertaining to all medical records, files, and communications related to cardiac patients, including prior review proceedings, revocations of hospital

2

privileges, disciplinary proceedings, and medical malpractice complaints of any kind, going back to 2006, in order to investigate potential federal health care offenses. On December 30, 2011, KDMC notified Darwin of this subpoena and sought coverage under its D&O policy. Darwin granted coverage.

On May 14, 2013, KDMC's insurance broker sent a letter notifying Allied of the subpoena and the continuing federal investigation. On June 12, 2013, KDMC received a litigation hold letter from counsel said to represent at least 500 potential claimants regarding cardiac procedures. On June 19, that letter was forwarded to Allied. On July 2, 2013, Allied responded that neither the May 14 nor June 19 letters constituted proper notice of circumstances that might give rise to a claim. In making that assessment, Allied noted that in order to properly constitute a notice of circumstances that could give rise to a claim, said notice must contain

> the time, date and place of the **Occurrence, Medical Professional Incident** or **Claim***;* a description of the **Occurrence, Medical Incident** or **Claim**; a description of the injury or damage which has allegedly resulted or may result from such **Occurrence, Medical Professional Incident** or **Claim**; how and when the **Insured** first became aware of such **Occurrence, Medical Professional Incident** or **Claim**; the names, addresses and ages of the injured parties; and the names and addresses of any witnesses.

Allied then stated the letters "do not refer to any of the specific circumstances that require prompt notice of 'any circumstances that could give rise to a **Claim**[.]'" Allied did note, however, that the subpoena attached to KDMC's May 14, 2013, letter was also submitted to Darwin in 2011 when KDMC sought coverage under its D&O policy. Accordingly, Allied stated Exclusion 15 was

implicated. This exclusion states that the Allied policy for 2012-13 would not apply to a claim "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving . . . any facts, matters, events, suits or demands notified or reported to, or in accordance with, any policy of insurance or policy or program of self-insurance in effect prior to October 16, 2012." Thus, Allied's position was that Exclusion 15 of the professional liability policy in 2013 potentially applied to deny coverage because KDMC had invoked its D&O policy with Darwin in 2011. As we shall see, Allied eventually embraced this understanding of the policy explicitly.

On September 30, 2013, the first medical malpractice claims against KDMC generally alleging unnecessary cardiac operations and lack of informed consent, among other allegations, were filed in Boyd Circuit Court. The same day, KDMC forwarded the complaints to Allied and Homeland. On November 20, 2013, Allied agreed to defend the Cardiac Litigation under a reservation of rights; specifically, that the 2011 invocation of the D&O policy constituted notice to a prior insurer of facts, matters or events giving rise to a claim. Allied invoked Exclusion 15, as well as two other exclusions, numbers 10 (intentional acts exclusion) and 16 (government-related claims exclusion).

At this juncture it is important to note the nature of these policies. They were annually renewed and renegotiated in order for applicable coverage and premiums to be adjusted. None of the insurers were bound to continue coverage beyond the time allotted in any one policy. Yet and still, both Allied and Homeland agreed to insure KDMC for the third policy period covering

4

October 16, 2012, to October 1, 2013. Both insurers concede that they had knowledge of the 2011 subpoena during the negotiation period for that policy period. This notice was sent by KDMC's insurance broker on August 28, 2012, to the insurers' application department for the specific purpose of "full disclosure" in negotiating the new policies. With this notice, Homeland even agreed to increase its excess liability policy from $10 million to $20 million for the 2012-13 period.

In May 2014, the DOJ investigation concluded with KDMC agreeing to pay approximately $40 million in fines, but KDMC conceded no liability or wrongdoing. Although this was a settlement in a sense, it was not a judicial settlement of any civil claims.[2] No judge signed in approval of the settlement and the language of the settlement itself only indicates that the United States has a basis for civil claims, but the settlement was meant to prevent litigation. In 2015, the Appellants filed a declaratory action in Boyd Circuit Court to determine their rights and coverage under the 2012-13 policies of Allied and Homeland for the Cardiac Litigation that first began in September 2013. In November 2015, the circuit court granted summary judgment to the hospital finding none of the three exclusions asserted by the insurers applied.

As to Exclusion 15, the circuit court ruled "the insurers are attempting to label the letter and the subpoena as something that they are not. There is

---

[2] The Court of Appeals apparently believed otherwise by stating the United States had asserted civil claims against KDMC. This statement misconstrues the record. No party has provided a copy of a complaint filed in a federal District Court alleging civil claims against KDMC by the United States, nor has any party provided a case number citation if one ever existed.

5

nothing contained therein that describes any supposed wrongful conduct, let alone any allegation of performing unnecessary cardiac procedures." The summary judgment was silent as to the issue of recoupment and for an obvious reason—the issue had not even been briefed. It was never before the trial court.

The insurers appealed. In a unanimous opinion, the Court of Appeals concluded that Exclusion 15 did apply because

> KDMC had previously secured coverage under its D&O policy with National [Darwin] regarding the DOJ investigation. KDMC's D&O policy qualified as 'any policy of insurance in effect prior to the Inception Date' of KDMC's Umbrella Policies with Darwin [Allied]. And, judging from the allegations set forth above in the various complaints filed in *In re: Cardiac Litigation,* the claims asserted in that mass of litigation unavoidably fell within the remaining ambit of this exclusion.

In other words, according to the Court of Appeals, the 2011 subpoena had identified who the DOJ was investigating and why it was investigating. However, it was years later, by virtue of the May 2014 settlement and the September 2013 civil complaint, that the what, where, and when were supplied. Or, using the contractual language, the facts, matters, and events were revealed which the hundreds of litigants in Boyd Circuit Court all asserted were the "common nexus" linking not only their complaints with one another but linking the entire Cardiac Litigation with the DOJ investigation.

The Court of Appeals also addressed and disposed of the three arguments of KDMC against the application of Exclusion 15. First, KDMC had argued that the words "any policy of insurance" should be read to only apply to other professional liability policies. The court rejected that as effectively

6

rewriting the contract. Second, KDMC argued that Allied determined the 2011 subpoena did not constitute notification of circumstances that might give rise to a claim. The court rejected that on the basis that nothing in the policy explicitly required notification to be contained in a single communication therefore, what was eventually revealed in May 2014 about the DOJ's three-year investigation is what effectively gave notice. Finally, the court rejected the arguments of KDMC that the insurers' position denied the reasonable expectations of the insured and rendered insurance coverage illusory. The court noted that the doctrine of reasonable expectations only applies to ambiguous language in the policy, which KDMC had never argued was an issue. As to illusory coverage, the court ruled "[c]overage is 'illusory' when the insured cannot foresee any circumstances under which he or she would collect under a particular policy provision." In effect, the insurers used Exclusion 15 to "hedge their bets" around what risk they were willing and unwilling to assume— with any possible litigation stemming from the same facts, matters, and events of the DOJ investigation being excluded. Indeed, Homeland specifically argued at oral argument that this was the case when it had agreed to the 2012-13 policy and increased its limits to $20 million. Notably, however, nowhere was this specific understanding conveyed to KDMC and Homeland conceded at oral argument that it was only a "fair inference."

Finally, the Court of Appeals ruled that the insurers were entitled to recoupment of their expenses thus far in defending the Cardiac Litigation despite acknowledging "[t]he issue of whether Darwin [Allied] and Homeland

7

can seek reimbursement after offering policy limits under a reservation of rights is not an issue before this Court[.]"

We granted discretionary review to consider whether Exclusion 15 applies to bar professional liability and excess coverage for the Cardiac Litigation and whether the Court of Appeals improperly ruled on the issue of recoupment. We now address the merits of the appeal.

## II. Standard of Review and Principles of Controlling Law

This case comes to us from a summary judgment. Summary judgment should only be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR[3] 56.03. "[T]he proper function of summary judgment is to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). "Because summary judgment does not require findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions." *Hammons v. Hammons,* 327 S.W.3d 444, 448 (Ky. 2010). Our review therefore is *de novo. Id.*

"*De novo* review extends to the trial court's interpretation of the insurance contract as a matter of law." *Thomas v. State Farm Fire & Cas. Co.,* 626 S.W.3d 504, 506 (Ky. 2021). "Additionally, we adhere to our long-held

---

[3] Kentucky Rules of Civil Procedure.

8

standard that when we interpret insurance contracts, perceived ambiguities and uncertainties in the policy terms are generally resolved in favor of the insured." *Id.* at 506-07. This rule of construction favoring coverage, however, "does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract." *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994). Nonetheless, "[a]s long as coverage is available under a reasonable interpretation of an ambiguous clause, the insurer should not escape liability, and the exclusionary provision addressed herein may be subject to more than one good faith interpretation." *Id.* at 227. An ambiguity may exist either on the face of the contract, i.e., from the nature of the language itself, or "when a provision is applied to a particular claim." *Id.* The latter is a latent ambiguity that arises when the contractual terms "are brought in contact with the collateral facts." *Carroll v. Cave Hill Cemetery Co.,* 189 S.W. 186, 190 (Ky. 1916). "When analyzing challenged terms for clarity we note that the terms of insurance contracts have no technical legal meanings and must be reasonably interpreted as they would be understood by a lay reader." *Thomas,* 626 S.W.3d at 507. Nevertheless, "an insurance company should not be allowed to collect premiums by stimulating a reasonable expectation of risk protection in the mind of the consumer, and then hide behind a technical definition to snatch away the protection which induced the premium payment."

*Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 837 (Ky. 2005) (quoting *Moore v. Commonwealth Life Ins. Co.*, 759 S.W.2d 598, 599 (Ky. App. 1988)).

Moreover, this Court has always "strongly adhered to a policy of protecting the reasonable expectations of policyholders." *Lewis ex rel. Lewis v. West American Ins. Co.*, 927 S.W.2d 829, 833-34 (Ky. 1996). "Although 'insurance carriers have the right to impose reasonable' limitations on their coverage, 'the question then becomes the reasonableness of the condition as a limitation on public policy as opposed to one of strict contract considerations between private parties where no public interest is involved.'" *Id.* at 834 (quoting *Jones v. Bituminous Cas. Corp.,* 821 S.W.2d 798, 802 (Ky. 1991).

### III.    Exclusion 15 Does Not Bar Coverage

Foremost in our consideration is the fact that no one disagrees that by the May 2014 DOJ settlement, the DOJ had clearly been investigating the same facts, matters and events from which the Cardiac Litigation also sprang. That fact, however, was not clear in May 2011 when the subpoena was first issued nor was it clear in July 2013 when Allied declared that the May 2011 subpoena and accompanying letters did *not* constitute adequate notice of circumstances giving rise to a claim. Curiously, the insurers now adopt the opposite reading of the subpoena and argue it did constitute adequate notice. Putting on the Janus[4] mask, the insurers embraced one reading of the

---

[4] Janus was a god of ancient Rome, always depicted with two faces.

10

subpoena then, the opposite reading now, whichever is convenient to justify the denial of coverage.

The critical facts to this Court are first, that prior to the institution of legal action in September 2013, the insurers had adopted the position that the 2011 subpoena did not constitute notice of circumstances that might give rise to a claim. The Court of Appeals surmounted this fact by holding that notice of circumstances did not have to occur in a single communication from the insured to insurer but could be developed over time from a multitude of sources. This ruling, however, is belied by the very denial at issue in this case. Allied took the position that the subpoena and the letters it was attached to did not constitute adequate notice because they lacked several critical facts stipulated by the policy in Section IV(D)(2) (see *supra*, Allied's July 2, 2013 letter). The terms of the policy unambiguously required notice "shall include" the "time, date and place" of the occurrence, incident, or claim; a description of it; "a description of the injury or damage which has allegedly resulted or may result from" it; how and when KDMC first became aware of it; and the identifying information of injured parties and witnesses. We do not doubt that in general, errors or omissions in notification may require supplementation and, in that respect, we would agree that notice does not require a single communication unless the policy specifically disallowed supplementation. But the Court of Appeals has erred in concluding that notice can be gathered over a matter of *years*—that is not a reasonable interpretation of the notice provision as would be understood by a lay reader. *Thomas*, 626 S.W.3d at 507.

11

The policy, by requiring time, date and place of an occurrence, incident, or claim, required a deal of specificity wholly lacking in a subpoena that sought a plethora of records between 2006 to 2011. The total responsive documentation amounted to approximately seven million documents.[5] Moreover, nowhere does the subpoena cite a specific incident by reference to a time, date, or place; nowhere does it give a description of injuries or damages, much less allege that any injuries or damages had occurred; and it does not in any way name any injured parties or witnesses.

Proverbially, hindsight is 20/20. And looking at this case from the perspective of 2022, the DOJ inarguably was investigating facts, matters, and circumstances shared by the Cardiac Litigation. But in this instance, hindsight is obscuring the reasonable interpretation of the language by a lay reader which sensibly supports the interpretation that the policy contemplates a great deal of specificity to constitute notice of circumstances giving rise to a claim that is absent from the subpoena. Because the subpoena did not constitute adequate notice of circumstances giving rise to a claim in 2011, it cannot be covered by Exclusion 15 in the professional liability policy and excess policy of 2012-13.

---

[5] It is worth noting that the subpoena received by KDMC in this case was issued pursuant to 18 U.S.C. § 3486, and the Supreme Court of the United States has declared such administrative subpoenas are "analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). It is "a power of inquisition[.]" *Id.* at 642. As such, wrongful conduct is not a prerequisite for a subpoena to issue.

This distinction is crucial since the insurers argued at oral argument that KDMC should have sought professional liability coverage under the 2010-11 policy. But because all the policies had mirrored language regarding what information was required to constitute notice of circumstances giving rise to a claim, we fail to see how KDMC could have reasonably expected to get professional liability coverage under the 2010-11 policy based on the subpoena alone. No claim had been made against them in 2011, and the DOJ investigation would not be concluded until 2014. This also defeats the insurers' argument in their briefing that they would provide professional liability and excess coverage for the 2011-12 policy period. No material fact had changed in that policy period—only the subpoena existed. No one disputes that it did not state a claim, and it was insufficient under the policy language to be a notice of circumstances giving rise to a claim by the insurers' own admission. KDMC therefore legitimately sought coverage under the 2012-13 policy because that was the policy in effect when the first claims were made against it in Boyd Circuit Court.

Arguably, however, such a conclusion ignores KDMC invoked and received coverage for the DOJ investigation under its D&O policy. That brings us to the second dispositive fact in our analysis, which is that both Allied and Homeland were aware of the subpoena and investigation prior to issuing the 2012-13 insurance policies. Both insurers argue that they issued the policies only because they believed Exclusion 15's terms would prohibit coverage for any claims related to the investigation. But they have failed to point to any

documentary evidence that this was in fact their understanding of Exclusion 15 when they issued the policy in October 2012, nor that such an understanding was communicated to KDMC. At oral argument, Homeland specifically conceded that this was only a "fair inference." But KDMC can respond with its own fair inference in kind, that by informing the insurers of the subpoena and investigation they expected the policy to cover any potential claims related to the DOJ investigation and assumed that risk would be factored into the premium payments.

True, we do not consider "the policyholder's subjective thought process regarding his policy[,]" *Sparks v. Trustguard Ins. Co.*, 389 S.W.3d 121, 128 (Ky. App. 2012), when resolving the reasonable expectations of policy coverage. But a latent ambiguity has arisen from the application of Exclusion 15 to the facts of this case, which entail that a) a DOJ subpoena was received in 2011; b) coverage was provided under a D&O policy for that investigation; c) the insurers were aware of the subpoena and did not understand it to be adequate notice of circumstances giving rise to a claim; and d) they nevertheless issued the liability and excess coverage for 2012-13. The latent ambiguity arises from the disputed effect notice of the subpoena and investigation had on the applicability of Exclusion 15 as understood by a lay reader to specifically prohibit coverage of the Cardiac Litigation.

Under our rules, not only is the insured's subjective understanding of the policy not considered, neither is the insurer's. What matters is "[a]s long as coverage is available under a reasonable interpretation of an ambiguous

14

clause, the insurer should not escape liability . . . and [if] it is susceptible to two interpretations, one favorable to the insured and the other favorable to the insurer, the former will be adopted." *St. Paul,* 870 S.W.2d at 227. Moreover, "[a]ny limitation on coverage or an exclusion in a policy must be clearly stated in order to apprise the insured of such limitations." *Id.* "[A]n insurance company should not be allowed to collect premiums by stimulating a reasonable expectation of risk protection in the mind of the consumer, and then hide behind a technical definition to snatch away the protection which induced the premium payment." *Aetna,* 179 S.W.3d at 837 (internal quotation omitted). In this case, the insurers stimulated the expectation of risk protection by failing to inform KDMC prior to the 2012-13 policies taking effect that they believed Exclusion 15 specifically applied to any potential claims related to the DOJ investigation. But having notice, it was incumbent on the insurers to clearly state in the policy that they would not insure any potential claims related to the DOJ investigation. Now the insurers wish to hide behind a sweepingly broad exclusion to elude coverage. A lay reader, knowing these facts, would reasonably understand the notice to essentially have defeated the generality of Exclusion 15.

This also demonstrates the error of the Court of Appeals when it reasoned "that known liabilities generally are not insurable." The lower court quoted *LaValley v. Virginia Sur. Co., Inc.,* 85 F.Supp.2d 740, 744 (N.D. Ohio 2000) (citing Russ and Segalla, Couch on Insurance § 102:7, at p. 102-17 (3rd ed. 1997)). That is indeed generally true and "where one applies for insurance

15

knowing that a loss has already occurred, conceals this fact, and procures a policy to be antedated so as to cover the period when the loss occurred, the policy is void because of such fraud or concealment . . ." § 102:7; see generally, 7 Couch on Ins. § 102:7. But an insurer, "having knowledge of an existing or potential claim prior to issuing the policy of insurance[,]" may still be held to provide coverage if, with this knowledge, indicated "the insured will be covered for such claim in order to obtain the insured's business." *Id.* As cited above, that is precisely the law in Kentucky. *Aetna,* 179 S.W.3d at 837.

Looking to our facts, KDMC never tried to conceal the fact of the DOJ investigation from its insurers. Darwin was notified in December 2011, and Allied and Homeland were informed in August 2012, during the negotiations for renewed coverage for October 2012-13. Thus, the general rule that known liabilities are not insurable is not operable here since first, the 2011 subpoena does not constitute notice of circumstances giving rise to a claim and therefore is a known liability only in an abstract sense of the term; and second, the insurers here, by having knowledge of the investigation but without specifically informing KDMC that they did not intend to provide coverage for any potential claims per Exclusion 15, lured KDMC into believing it had obtained coverage for any potential claim should one be made in the course of the 2012-13 policy timeframe.

Therefore, we reverse the Court of Appeals and reinstate the trial court's summary judgment as to the inapplicability of Exclusion 15 to bar coverage.

16

**IV. Court of Appeals Lacked Jurisdiction to Rule on Recoupment**

Finally, we address the issue of recoupment which was not identified as an issue on appeal before the Court of Appeals nor was it briefed by the parties before that court. Most importantly, the trial court had not made any final judgment or order as to recoupment. Yet and still the Court of Appeals issued its own judgment upon this question even though it acknowledged the issue was not before it. Where there is no final order on a particular question from the trial court, an appellate court lacks subject-matter jurisdiction over that issue. Ky. Const. § 111(2); *Erie Ins. Exchange v. Johnson*, 647 S.W.3d 198, 204 (Ky. 2022).

Subject-matter jurisdiction goes to whether a court has "'power to do anything at all.'" *Commonwealth Health Corp. v. Croslin*, 920 S.W.2d 46, 48 (Ky. 1996) (quoting *Duncan v. O'Nan*, 451 S.W.2d 626, 631 (Ky. 1970)). Thus, a judgment absent subject-matter jurisdiction is void *ab initio. Upper Pond Creek Volunteer Fire Dept. v. Kinser*, 617 S.W.3d 328, 333 (Ky. 2020). We remind the lower court that

> On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.

*Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900). This duty stems from the "nature and limits of the judicial power. . . ." *Id.* "Every exercise of jurisdiction is original, where the complaint is heard by that tribunal in the first instance, before any other tribunal is resorted to." *Smith v.*

17

*Carr*, 3 Ky. 305, 3 (Ky. 1809). And since the Kentucky Constitution grants to the Court of Appeals only an appellate jurisdiction (with an exception not pertinent here), its ruling upon recoupment absent any final judgment from the trial court below flouted this constitutional stricture. *Id.* at 4. The Court of Appeals is reversed.

## V. Conclusion

Per unambiguous policy language, the 2011 subpoena did not constitute notice of circumstances giving rise to a claim. Considering the information specifically required by the policy to be included in a notice of an occurrence, incident, or claim, the subpoena simply fails to convey key facts with the requisite specificity a lay reader would understand to be required, and wholly omits other facts such as injured persons and witnesses. Moreover, we do not believe a reasonable interpretation of the policy supports the proposition that notice could be gathered over multiple years. Instead, a lay reader would understand that notice is required to be given in a single communication with some supplementation allowed within a reasonable amount of time in case of errors or omissions, a circumstance not at issue here.

Secondly, the insurers, by failing to inform KDMC prior to issuing the 2012-13 policy that they understood Exclusion 15 to specifically bar coverage for any potential claims related to the DOJ investigation (which at the time had still not yet been resolved with any specificity), they stimulated the expectation of risk protection. Because this argument centered upon the effect the notice of the 2011 subpoena had upon the general language of Exclusion 15 as the

18

parties understood it, constitutes a latent ambiguity. Well-settled rules require resolution in favor of coverage. Therefore, we hold Exclusion 15 does not bar coverage and we reverse the Court of Appeals.

Finally, the Court of Appeals lacked jurisdiction to consider the issue of recoupment for expenses, and continues to do so upon remand, and we reverse that ruling as well. We remand back to the Court of Appeals to consider the applicability of Exclusions 10 and 16 also invoked by the insurers and denied by the trial court but not considered by the appellate court due to its adjudication on Exclusion 15.

Minton, C.J., and Hughes, Keller, VanMeter, Nickell and Conley, JJ., sitting. Hughes, Keller, VanMeter, and Nickell, JJ., concurring. Minton, C.J., concurring in part and dissenting in part by separate opinion. Lambert, J., not sitting.

MINTON, C.J., CONCURS IN PART AND DISSENTS IN PART:  I respectfully dissent.  I concur in the majority's conclusion that the Court of Appeals lacked jurisdiction to rule on recoupment of legal fees.  But I disagree with the majority's conclusion that the Prior Notice of Events Exclusion—Exclusion 15—did not preclude insurance coverage on this record.

Exclusion 15 to the Darwin professional-liability insurance policy precludes insurance coverage because Exclusion 15 is unambiguous both facially and as applied to the claims submitted by King's Daughters Medical Center ("KDMC").  Applying the plain text of Exclusion 15 to the record here, the information contained in the *subpoena duces tecum* from the Department of

19

Justice (the "DOJ subpoena") provided ample notice of circumstances that could give rise to a claim under the liability policies.[6] In July 2011, the DOJ subpoena put KDMC on notice of potential liability under the professional-liability policies. But, while KDMC sought coverage under its director's and officer's ("D&O") policy after receiving the DOJ subpoena, it failed to provide notice of potential claims under the liability policies until 2013. KDMC's failure to provide notice of potential claims under the professional-liability policies falls squarely within the textual limitations of Exclusion 15. As a result, the portion of the Court of Appeals' decision finding that Exclusion 15 barred coverage under the liability policies should be affirmed.

I share the majority's concern with Allied's inconsistent positions regarding whether KDMC's May 14, 2013, or June 19, 2013, letters constituted proper notice of circumstances that may give rise to claims. And, as the majority notes, Allied and Homeland concede that they had knowledge of the 2011 subpoena during the negotiation period for the 2012–2013 policy period. But the insurers argue that KDMC engaged in the exact behavior that Exclusion 15 is designed to prevent. KDMC was fully aware in 2011 of potential professional-liability claims arising from the DOJ's investigation of specific doctors during a specific period. The insurers argue that KDMC metaphorically obtained fire insurance for a building that was

---

[6] There are two insurance policies at issue in this matter. The first is the Darwin Select (Allied) professional-liability policy. The second is an excess policy issued by Homeland Insurance Company of New York. I refer to the plural policies for ease of reference.

20

already aflame. As the insurers see it, KDMC knew in 2011 that the DOJ had initiated an investigation into KDMC for performing and billing for allegedly unnecessary cardiac procedures. But instead of notifying the insurers of this potential claim, the insurers contend that KDMC intentionally failed to provide notice of potential claims and increased its insurance coverage for the 2012–13 policy period. Of course, KDMC denies the insurers' characterization of events. None of the parties appear to come to this Court with clean hands.

So how do we resolve situations where none of the parties come to our Court with clean hands? We dispassionately apply the law. It is well-established that, under Kentucky law, "an insurance policy is a contract, and insofar as it does not contravene the law any recovery against the insurance company is governed solely by its terms."[7] True, when interpreting insurance policies, "exclusions are to be narrowly interpreted and all questions resolved in favor of the insured."[8] And "[e]xceptions and exclusions are to be strictly construed so as to render the insurance effective."[9]

But these canons are only applicable "when the language of the insurance contract is ambiguous or self-contradictory."[10] "Otherwise, the

---

[7] *State Farm Mut. Ins. Co. v. Fireman's Fund Am. Ins. Co.*, 550 S.W.2d 554, 557 (Ky. 1977); *see also Masler v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 633, 635–36 (Ky. 1995); *Woods v. Standard Fire Ins. Co.*, 411 F. Supp. 3d 397, 401 (E.D. Ky. 2019); *Associated Indus. of Ky., Inc. v. United States Liab. Ins. Grp.*, 531 F.3d 462, 465 (6th Cir. 2008).

[8] *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859–60 (Ky. 1992) (citations omitted).

[9] *Id.*

[10] *Peoples Bank & Trust Co. v. Aetna Cas. & Surety Co.*, 113 F.3d 629, 636 (6th Cir. 1997) (applying Kentucky law).

contract is to be read according to its plain meaning, its true character and purpose, and the intent of the policies."[11]  In the context of interpreting insurance policies

> [t]he rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract. Neither should a nonexistent ambiguity be utilized to resolve a policy against the company. We consider that courts should not rewrite an insurance contract to enlarge the risk to the insurer.[12]

We enforce the unambiguous language of insurance policies to effectuate the intent of the parties for good reason.  The insurance policies at issue here were negotiated by and between highly sophisticated parties.  As such, we must apply the plain language of the insurance policy to effectuate the intent of the parties.

But here, the majority does not conclude that the text of Exclusion 15 is ambiguous or self-contradictory.  Instead, the majority concludes that Exclusion 15 is inapplicable for two reasons.  First, the majority contends that the information contained in the DOJ subpoena did not constitute notice of circumstances giving rise to a claim under the liability policies.  Second, the majority contends that "the insurers here, by having knowledge of the investigation but without specifically informing KDMC that they did not intend

---

[11] *Id.*; *see also Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 630 (Ky. 2005) ("When the terms of an insurance contract are unambiguous and not unreasonable, they will be enforced.").

[12] *St. Paul Fire & Marine Ins. Co. v. Powell–Walton–Milward, Inc.*, 870 S.W.2d 223, 226–27 (Ky. 1994) (citation omitted).

22

to provide coverage for any potential claims per Exclusion 15, lured KDMC into believing it had obtained coverage for any potential claim should one have been made in the course of the 2012–13 policy timeframe." But this conclusion is a misapplication of the undisputed facts to the unambiguous policy language.

First, we look at the relevant policy language. The Darwin policy defines "Claim" as "a written demand seeking monetary damages." And "Related Claims"—"Claims based on or arising out of or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts"—are treated as one Claim.

In its entirety, the exclusion contained in part III, section D, number 15 ("Exclusion 15") of the policy states:

> The Policy shall not apply to any Claim based on, arising out of, directly or indirectly resulting from, or in any way involving . . . any facts, matters, events, suits or demands notified or reported to, or in accordance with, any policy of insurance or policy or program of self-insurance in effect prior to the Inception Date stated in Item 2(a) of the Declarations.

The plain and unambiguous text of Exclusion 15 expressly precludes insurance coverage for any Claims involving facts, matters, events, suits or demands occurring before the 2012–13 policy inception date.

Next, we apply the unambiguous language of Exclusion 15 to the facts of this case. The DOJ subpoena included ample, detailed information that provided KDMC notice of a claim under the liability policies. In fact, even under Allied's assessment of circumstances that would give rise to prior notice, which are extraneous to the unambiguous policy language, the subpoena

23

provided sufficient information regarding circumstances that could give rise to a claim under the liability policies.

For instance, the DOJ subpoena provided information about *when* the alleged unnecessary procedures occurred. The subpoena referred to "documents that were created, received[,] or dated at any time during the period of August 1, 2006[,] to the present."[13]

The subpoena also made clear *what* specific procedures were being investigated by DOJ. The subpoena sought "[a]ll medical records and files, digital images[,] and/or films of catheter procedures, intracoronary stent placements, billing records, and schedules reflecting cath lab usage pertaining to all patients treated in the hospital by physicians associated with Cumberland Cardiology and the Kentucky Heart Institute[.]" The subpoena further clarified that "[t]he requested documents include but are not limited to: (a) angiograms; (b) records of stress tests; (c) nuclear/echo image EKG; (d) intravascular ultrasound; (e) fluoroscopic film and (f) fractional flow reserve records." Finally, the subpoena sought "[n]ames and records of any and all patients who died and/or suffered complications as a result of or within one month of an angioplasty from August 1, 2006, to present."

The subpoena clearly identified *who* were the targets of the DOJ's investigation. The subpoena sought records and files for "Richard E. Paulus, Zane Darnell, Sriharsha Velury, Matthew Shotwell; Christopher Epling, Ahmed Elsber, Richard Ansinelli, Michelle Friday, and Arshad Ali."

---

[13] The DOJ subpoena was dated July 25, 2011.

Taken together, the information contained in the DOJ subpoena provided ample notice to KDMC of potential claims under its professional-liability policies. It is of no moment that the DOJ subpoena did not exhaustively explain each fact and circumstance of the investigation. Nor is Allied's inconsistency concerning the required specificity of proper notice of a prior claim dispositive. The crucial fact is that, on the face of the subpoena, any reasonable person, especially a reasonable healthcare professional or attorney, would be aware that the DOJ was investigating potential impropriety by specified doctors performing cardiac procedures at KDMC. KDCM knew that alleged impropriety by doctors performing cardiac procedures could lead to claims under its professional-liability policies. The insurers argue convincingly that an immediate 70-percent reduction post-subpoena in the number of cardiac procedures performed strongly indicates KDMC's total awareness of its level of potential claims exposure. And KDMC was best positioned to determine which procedures the DOJ was investigating that may eventually lead to claims under the professional-liability policies. At bottom, if a *subpoena duces tecum* from the Department of Justice requesting records pertaining to specific cardiac procedures, over a specified period, and involving several named doctors, does not provide notice of a potential professional-liability insurance claim, it is difficult to imagine circumstances that would put an insured on notice of a potential professional-liability claim.

In fact, in response to the DOJ subpoena, KDMC sought coverage to protect its directors and officers under its D&O policy. This fact demonstrates

25

that the DOJ subpoena put KDMC on notice of potential liability for its directors and officers arising from the information contained in the subpoena, even though none of KDMC's directors or officers were named in the subpoena. The same facts and circumstances that led to potential liability for KDMC's directors and officers provided a factual basis for potential professional-liability claims.

Ultimately, the DOJ subpoena clearly provided the who, what, when, and where regarding the investigation into cardiac procedures performed at KDMC. This put KDMC on notice of potential claims under its professional-liability policies. So, I would affirm the holding of the Court of Appeals, in part, as to Exclusion 15's preclusion of insurance coverage; but I would join the majority in reversing the Court of Appeals' holding as to recoupment.

COUNSEL FOR APPELLANTS:

Kimberly S. McCann
W. Mitchell Hall, Jr.
VanAntwerp Attorneys, LLP

Perry M. Bentley
Todd S. Page
Stoll Keenon Ogden PLLC

COUNSEL FOR APPELLEES:

Jamie Wilhite Dittert
Strugill, Turner, Barker & Moloney PLLC

Jonathan D. Hacker
O'Melveny & Myers LLP

Jeffrey Michael Cohen
Carlton Fields Jorden Burt PA

Ronald G. Sheffer
Sheffer & Monhollen, PLLC

Charles E. Spevacek
William M. Hart
Meagher + Geer, P.L.L.P.


COUNSEL FOR AMICUS CURIAE,
KENTUCKY HOSPITAL ASSOCIATION:

Wesley R. Butler
Kimberly G. DeSimone
Barnett Benvenuti & Butler PLLC

COUNSEL FOR AMICUS CURIAE,
KENTUCKY JUSTICE ASSOCIATION:

Kevin C. Burke
Jamie K. Neal
Burke Neal PLLC

COUNSEL FOR AMICUS CURIAE,
UNITED POLICYHOLDERS:

Kyle R. Salyer
Tyler J. Wicker
Morgan, Collins, Yeast & Salyer